### A11A1818. TIEGREEN v. THE STATE.
(726 SE2d 468)

PHIPPS, Presiding Judge.

In connection with a single incident, Christopher Tiegreen was indicted for aggravated assault, two counts of criminal attempt to commit a felony, false imprisonment, battery, sexual battery, and cruelty to a child in the third degree. He filed a plea of mental incompetency to stand trial, which was tried in a competency proceeding before a special jury. The jury returned a verdict finding that Tiegreen was competent to stand trial, and judgment was entered thereon. Tiegreen appeals, contending that the evidence was insufficient to support the verdict and that the trial court erred in charging the jury. We affirm.

1. We consider first Tiegreen's challenge to the sufficiency of the evidence.

OCGA § 16-2-3 establishes the rebuttable presumption that every person is mentally competent to stand trial.[1] OCGA § 17-7-130 permits a criminal defendant to procure review of his or her mental competency by properly alleging mental incompetency to stand trial.[2] Once alleged, the court is required to conduct a trial to determine the defendant's mental competency.[3]

"In a competency proceeding, the defendant has the burden of proving incompetency by a preponderance of the evidence."[4]

> The constitutional test for competency seeks to determine whether the defendant is capable of understanding the nature and object of the proceedings, whether he comprehends his own condition in reference to such proceedings and whether he is capable of rendering his counsel assistance in providing a proper defense.[5]

The standard of appellate review is whether, after reviewing the evidence in the light most favorable to the state, a rational trier of

---

[1] See *Sims v. State*, 279 Ga. 389, 390 (1) (614 SE2d 73) (2005).
[2] See id.
[3] OCGA § 17-7-130; *Sims*, supra.
[4] *Velazquez v. State*, 282 Ga. 871, 872 (1) (655 SE2d 806) (2008) (citation omitted).
[5] *Sims*, supra (citations omitted).

fact could have found that the defendant failed to prove by a preponderance of the evidence that he was incompetent to stand trial.[6]

In support of his claim of incompetency, Tiegreen presented at the trial held on August 2, 2010 two witnesses: his mother and a psychologist. Tiegreen's mother testified that Tiegreen had a normal childhood until November 15, 2001. At sixteen years old, Tiegreen was involved in an automobile accident in which he sustained a traumatic brain injury (TBI). Thereafter, Tiegreen began to display behavioral problems — e.g., exercising extremely poor judgment; lacking impulse control; engaging in socially inappropriate behaviors, including touching others; becoming aggressive toward family members and others around him who stood in the way of what he wanted to do; and attempting repeatedly to run away from home. Over the course of about eight years, Tiegreen was placed in various residential settings, where he received specialized care. In March 2007, at age 22, Tiegreen was living in one such setting, a duplex, where multiple care givers supervised him 24 hours a day. During his stay at this location, Tiegreen nevertheless fled the premises.

The charges against Tiegreen were summarized to the jury, based on a pretrial ruling procured by the defense, as:

> [T]his case arises from an incident that occurred on September the 11th of 2009 in which the Defendant, Mr. Tiegreen left a supervised group home and went to the yard of a nearby residence where he is alleged to have assaulted [a woman]. A delivery driver intervened and the incident was over at the point of that . . . intervention by the delivery driver.

Tiegreen's mother — in an effort to facilitate aiding her son, given his TBI — had earned in 2005 a Master's Degree in clinical counseling psychology; at the time of the competency trial, she was working toward a doctorate in clinical psychology. She testified that Tiegreen did not have "the ability to assist in his own defense. He's liable to say things that would incriminate him. I doubt very seriously that he grasps the gravity of this."

Tiegreen's second witness was a psychologist with a Ph.D. in clinical psychology, who had an extensive background in neuropsychology. He was tendered and qualified, without objection, as an expert in clinical psychology, forensic psychology, neuropsychology, and TBIs. As explained by this psychologist, a TBI can cause

---

[6] *Velazquez*, supra at 873 (1); *Sims*, supra at 391 (1).

cognitive impairment. Based upon his evaluation of Tiegreen, the psychologist opined that, as a result of his particular TBI, Tiegreen was incompetent to stand trial.

As part of evaluating Tiegreen, the psychologist reviewed Tiegreen's medical records related to injuries he had received in his automobile accident; they showed that Tiegreen had suffered a TBI. In addition, the psychologist reviewed the reports of approximately five other psychologists who had conducted psychological evaluations of Tiegreen since his accident, and he reviewed Tiegreen's educational records from the schools he had attended.

The psychologist also met with and interviewed Tiegreen over two days, April 27 and April 30, 2010, both times at a jail. The jail, the psychologist recalled, contributed "some background noise" into the evaluation setting, and Tiegreen "became distracted at points and we would have to take short breaks until the noise would pass, and I'd kind of redirect him back to what we were doing." The psychologist found Tiegreen cooperative and pleasant — although at times, distracted, not appearing to appreciate the seriousness of what was occurring (including joking and reciting lines from movies or songs), and requiring redirection to the task at hand.

The psychologist, who had also reviewed the indictment and police investigative reports concerning the criminal incident, determined that Tiegreen demonstrated a general understanding of the charges against him, as well as an ability to recall and relate facts underlying the criminal charges. In particular, Tiegreen told the psychologist that he had been left alone for a brief period at the duplex; that he then ran outside, where he encountered a woman; and that the woman was holding a child. Tiegreen next described what he had done to the woman and recalled that the woman had dropped the child.[7] The psychologist further ascertained that Tiegreen had a good relationship with his defense attorney, that he could relate to his defense attorney the events that transpired on the day in question, and that he would cooperate with his attorney.

The psychologist administered various cognitive tests to Tiegreen. One test, the psychologist determined, showed that Tiegreen's IQ was 72, a score considered at the third percentile of the general population and above mental retardation. The psychologist summarized that various other cognitive tests showed significant

---

[7] After a bench conference ensued, the court instructed the jury,
This is a trial about the competency of the Defendant to stand trial. It's not a trial about what may have actually happened on the day that these offenses may have arisen from. So, I want to caution you that . . . to the extent that information is brought in about the conduct that is charged, it is only admissible to the extent it shows anything about his competency. . . .

levels of impairment in Tiegreen's "attention related skills, especially processing speed, how quickly the brain can process information," as well as in most areas of his executive abilities — "reasoning, planning, organization skills, judgment."

In particular, the psychologist administered to Tiegreen the MacArthur Competence Assessment Tool (MacCAT), which he labeled a "gold standard test" for determining competency. The psychologist explained that the MacCAT is commonly used by neuropsychologists (and forensic psychologists) to assess the examinee's skills of understanding, appreciation, and reasoning. In each of these three domains, the psychologist testified, Tiegreen's performance on the MacCAT showed impairment.

In addition, the psychologist administered to Tiegreen the Fitness Interview Test, Revised (FIT-R).[8] The psychologist explained that both the FIT-R and the MacCAT were designed to assess the effects of a brain injury. According to the psychologist, Tiegreen's performance on the FIT-R showed impairment in his ability to understand the nature and object of the pending criminal proceedings, his ability to understand and appreciate possible consequences, and his ability to communicate with his counsel. In particular, the psychologist determined that Tiegreen showed a "superficial understanding" of the roles of defense attorney, prosecutor, and judge"; the psychologist determined also that Tiegreen seemed not to understand the concept of the different pleas.

The psychologist was also asked at trial for his opinion on a note, stipulated as having been written by Tiegreen and given to one of the lawyers representing him at the competency trial. The note stated:

> Dear [Attorney],
>
> It is not ok for me to go back to [a specified hospital/residential-setting]. I want you to agree or to plead or even to suck-up to the judge about me going to [a different, specified hospital/residential-setting]. If you choose to accept this mission, or accomplish this task, my mom will give you . . . $1,000,000.00.[9]
>
> Sincerely, Chris Tiegreen.

---

[8] The psychologist described, "[I]t's a structured interview that guides the examiner through a number of questions, areas to ask about that are important, specifically for criminal competency issues." The psychologist explained further that the examiner assigns a numerical point value to each response given by the examinee and that "it is more subjective. There's more room for clinical judgment in the FIT-R than there is on the MacArthur."

[9] (Ellipsis in note.)

According to the psychologist, the note "would appear to indicate impairment, the lack of appreciation of how the whole courtroom process works" and that "[i]t does not seem to indicate competency to me."

The state's sole witness was a psychologist with a Ph.D. in clinical psychology who further had a specialty in forensic psychology. She had worked in Georgia since 2003 as a forensic psychologist evaluating individuals for trial competency and criminal responsibility, some of whom had suffered TBIs. She was tendered and qualified, without objection, as an expert in the fields of clinical psychology and forensic psychology. She opined that Tiegreen was competent to stand trial, detailing her underlying clinical observations of Tiegreen and the results of tests that she administered to him.

She had initially evaluated Tiegreen in December 2009. The following month, she began the process of conducting a forensic evaluation. She reviewed, among other things, police records regarding the alleged offenses, as well as several IQ tests[10] and numerous other mental health evaluations conducted since Tiegreen's automobile accident. And she interviewed Tiegreen in a hospital in January and February 2010.

The state's psychologist testified that Tiegreen approached the interviews in a serious manner and was cooperative and focused throughout them. She recounted only a single instance when Tiegreen's attention was momentarily diverted.[11] The psychologist described that Tiegreen's speech was slowed somewhat, but clear and of normal volume; his behavior was appropriate; and his thought processes were logical and goal-oriented. Because she had extensively reviewed the results of the multiple tests of Tiegreen's intellectual functioning that had been done in 2002, 2003, 2006, and 2007, she administered no formal intellectual testing at that time.

In July 2010, days before the competency trial, the state's psychologist conducted another interview — this time in a jail. She recalled a few instances during that two-and-a-half hour evaluation when Tiegreen became distracted;[12] each time, however, he was

---

[10] Tiegreen's own expert psychologist acknowledged on cross-examination that he had reviewed prior evaluations of Tiegreen's IQ – one administered in 2002, on which Tiegreen scored 87; and one administered in either 2006 or 2007, on which Tiegreen scored 85. When asked about the discrepancy between the mid-80s scores and the low-70s score, Tiegreen's expert testified that the prior tests were not full tests, unlike the one he had administered.

[11] The psychologist recounted: "[A]nother patient [was] making a lot of noise on the other side of a closed door, . . . cursing and screaming and banging on the door and Mr. Tiegreen got up like he was going to go tell him to be quiet and I told him to please sit down. Let the staff handle that and he did."

[12] For instance, the psychologist recounted that, early during the evaluation, rather than answer one of the questions, Tiegreen commented that he had not heard the question because

"easily redirected back" to the question and was thus cooperative, paying attention, focusing on the questions, and giving appropriate answers.

During this visit with Tiegreen, the psychologist administered the MacCAT. She found that Tiegreen's scores fell in the minimal or no impairment range on the understanding and the reasoning sections and that he scored in the mild impairment range on the appreciation section. She testified that Tiegreen's performance on the MacCAT was consistent with her opinion that he was competent to stand trial.

The state's psychologist determined that Tiegreen understood the nature and object of the proceedings against him. Tiegreen had described the basic roles and responsibilities of courtroom personnel, stating, for example, that the defense attorney was on his side, would keep him out of trouble, and would talk to the judge and prosecutor. Tiegreen stated that the prosecutor's job was to "sue" him; when the psychologist asked him what he meant by that, he answered that the prosecutor would try to find him guilty. Tiegreen stated that the prosecutor was charged also with presenting evidence against him in court and that the prosecutor would try to send him to jail or prison. He described the judge's role as keeping order in the court, and he described the jury as 12 to 15 people who would decide which way the verdict would go, after listening and paying attention to the victim, the defendant, the defense lawyer, and the prosecutor. The psychologist testified that Tiegreen was able also to describe a plea agreement, as well as the advantages and disadvantages of accepting a plea agreement.

The state's psychologist determined that Tiegreen exhibited a basic comprehension of his own condition in reference to the proceedings. Tiegreen had described the charges against him and provided an account of what had happened during the criminal incident. As potential witnesses against him, he listed the woman, the delivery man, and a neighbor who was outside checking her mail at the time. The neighbor, Tiegreen added, was a half-mile away, and he proposed checking whether she wore glasses or contacts and whether she had them on at the time. Tiegreen also understood that he was facing a lengthy term of imprisonment.

The psychologist determined that Tiegreen had the ability to assist his attorney in his defense. He told the psychologist that he did not want to represent himself and expressed a willingness to work with his attorney. He described his expectation that his attorney

---

he was "looking at [her] beautiful eyes." And later, after being asked a different question, he commented that he liked her toenails.

would help him make the best decisions, and he stated that he could assist his attorney by telling him the truth about what happened.

The psychologist conceded that a note written by Tiegreen to his lawyer about his case could provide insight into how he related himself to the proceedings. However, the psychologist further recounted that she had specifically tested Tiegreen for whether he harbored any delusion that would interfere with his ability to understand his situation. She concluded from Tiegreen's test responses that he did not.

On appeal, Tiegreen points out that the state's expert did not administer the FIT-R to him, whereas his expert did. But even Tiegreen's expert acknowledged that no specific test was required for determining mental competency; that both the MacCAT and the FIT-R were among the available tools; and that the protocol may appropriately vary, depending on the examiner, the client, and various other circumstances. Notably, Tiegreen's expert labeled the MacCAT as a "gold standard test"; and the state's expert did administer that test, as part of her overall evaluation.

Tiegreen points out that even the state's expert recounted instances that (Tiegreen claims) showed that he continued to experience difficulty concentrating and responding to questions. Notwithstanding those instances, the state's psychologist ultimately found him to be focused on the questions asked and "easily redirected" when instructed. And she described that Tiegreen was cooperative throughout the interviews, that he approached them in a serious manner, and that his thought process was logical and goal-directed.

Tiegreen cites evidence that his behavioral problems stemmed from his TBI, and he points out that his expert specialized in neuropsychology, whereas the state's expert did not. Tiegreen asserts further that the state's expert was not as credentialed as his expert. However, "[t]he jury can consider the expert's credentials and then give such weight and credit to the expert's testimony as it sees fit."[13] Here, the jury heard extensive testimony concerning the professional backgrounds of the two psychologists, and Tiegreen did not object to the state's psychologist testifying as an expert in her specialty areas.[14] Furthermore, the state's expert testified that, in reaching her opinion that Tiegreen was competent to stand trial, she had taken into consideration that he suffered from a brain injury; that he had a history of problems with impulse control, including aggres-

---

[13] *McCoy v. State*, 237 Ga. 118, 119 (227 SE2d 18) (1976) (citation omitted).

[14] See generally *Adams v. State*, 275 Ga. 867, 868 (3) (572 SE2d 545) (2002) (fact that expert witness did not hold a medical degree went only to the weight the jury may give her testimony).

siveness and sexual inappropriateness; and that he had continued to exhibit poor judgment and impulsive behavior. And the jury was aptly instructed on the use of expert testimony.

What is more, Tiegreen elicited before the jury his own expert's criticisms of the state's expert's testing manner and scoring. But on cross-examination, Tiegreen's expert acknowledged that examiners have some discretion with respect to how testing is administered and scored. Further, Tiegreen's expert acknowledged that an individual with an IQ of 72 is "not automatically" incompetent to stand trial.[15]

Tiegreen has demonstrated no basis for reversal. The jury, not this court, resolves conflicts in the testimony and weighs the evidence.[16] And decisions regarding credibility are uniquely the province of the jury, which was not required to accept the testimony of Tiegreen's witnesses, nor to disbelieve that of the state's witness.[17] The evidence, viewed in the light most favorable to the state, authorized a rational trier of fact to conclude that Tiegreen failed to prove by a preponderance of the evidence that he was not competent to stand trial.[18] Nothing in *Wallace v. Kemp*,[19] relied upon by Tiegreen, mandates an outcome in Tiegreen's favor.

2. Tiegreen contends that the trial court erred in responding to the jury when it sent out a note during deliberations requesting "further insight into the meaning of 'giving the attorney representing him such assistance as a proper defense to the charges,' " a factor to be considered when determining mental competency.[20]

The record shows that, during the original final charge, the court instructed the jury:

> [T]he question for your determination is whether the Defendant, Christopher Tiegreen, is at this time capable of (a) understanding the nature and object of the proceedings, (b) understanding his own situation in reference to such proceedings, and (c) giving the attorney representing him such assistance as a proper defense to the charges demands.

After having received the jury's note, the judge conferred with the prosecutor and defense counsel, discussing particularly *Sims v.*

---

[15] See *Sims*, supra at 393 (2) (a low IQ score alone is not a determinative finding that a defendant is unable to stand trial).

[16] See *Buford v. State*, 309 Ga. App. 368 (710 SE2d 582) (2011).

[17] See id. at 368-369.

[18] See *Velazquez*, supra at 872-875 (1); see also *Hester v. State*, 283 Ga. 367, 369 (3) (659 SE2d 600) (2008); see generally *Wadley v. State*, 295 Ga. App. 556 (672 SE2d 504) (2009).

[19] 757 F2d 1102 (11th Cir. 1985).

[20] *Sims*, supra at 390 (1).

*State*,[21] wherein the Supreme Court of Georgia set forth:

> The factors to consider in determining a defendant's capability to assist in his defense include whether the defendant can adequately consult with others, knows the names and functions of those involved with the case, and reasonably understands the rules, the specific charges, the penalties and the consequences of the proceedings.[22]

Accordingly, the trial judge responded to the jury in writing:

> Giving the attorney representing him such assistance as a proper defense to the charges demands includes whether the defendant can adequately consult with others, knows the names and functions of those involved with the case, and reasonably understands the rules, the specific charges, the penalties and the consequences of the proceedings. Please consider this additional instruction along with all the other instructions given you by the Court.

The jury asked no further question.

On appeal, Tiegreen complains that the trial court did not give further instruction based upon other language in *Sims* concerning what "competency also encompasses."[23] Tiegreen describes that the additional language comprised "a list of possibilities that jurors may consider in the competency equation."

It is axiomatic that "[t]he need, breadth, and formation of additional jury instructions are left to the sound discretion of the trial court."[24] Where, as here, the jury requests further instructions upon a particular legal point, the court "in [its] discretion may recharge them in full, or only upon the point or points requested."[25] "The refusal to give a requested charge, even though it is a correct

---

[21] Supra.

[22] *Sims*, supra at 392 (2) (citation and punctuation omitted).

[23] The additional language states:

Competency also encompasses the ability to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.

*Sims*, supra at 392-393 (2).

[24] *Peebles v. State*, 260 Ga. 165, 167 (5) (a) (391 SE2d 639) (1990) (citation omitted).

[25] *Watson v. State*, 289 Ga. 39, 44 (10) (709 SE2d 2) (2011).

statement of law and pertinent and material to an issue in the case, is error only if it contains information that is not *substantially* covered by the charge actually given."[26] "In determining whether the recharge was erroneous, this [c]ourt must consider the original charge given as a whole as well as the recharge in light of the original charge."[27]

Here, the trial court's original charge on "mental condition of the defendant" was proper, apt, and tracked the pattern jury charge on mental competency.[28] The jury's request for additional instruction was specific, and the court's response thereto provided legally correct additional instruction on that particular point.[29] After receiving the additional instruction, the jury did not indicate any continuing doubt. Although Tiegreen maintains that charging also other language from *Sims* would have further supplied the jurors with a list of possibilities for consideration, the trial judge made the decision not to do so based on his stated concern not to "give them so much that it becomes less than helpful."

We cannot conclude that the trial court thereby abused its discretion. As stated above, "[w]here a jury requests a charge or recharge on a particular point, it is within the discretion of the judge to also give or not give additional instructions."[30] "[Tiegreen] has failed to show any indication that the jury was confused or left with an erroneous impression of the law."[31]

> Where a charge as a whole substantially presents issues in such a way as is not likely to confuse the jury even though a portion of the charge may not be as clear and precise as could be desired, a reviewing court will not disturb a verdict amply authorized by the evidence. There is no error where it is unlikely that the instructions considered as a whole would mislead a jury of ordinary intelligence.[32]

Given the foregoing, the trial court's decision not to give the additional language requested by Tiegreen was not reversible error.[33]

*Judgment affirmed. Andrews and McFadden, JJ., concur.*

---

[26] *Velazquez*, supra at 877 (7) (citation omitted; emphasis supplied).

[27] *Khan v. State*, 235 Ga. App. 229, 232 (4) (509 SE2d 137) (1998).

[28] See *Velazquez*, supra at 876-877 (7); Council of Superior Court Judges, Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (4th ed.), § 3.90.20 ("Mental Condition of the Defendant").

[29] See *Sims*, supra.

[30] *Walter v. State*, 256 Ga. 666, 668-669 (2) (352 SE2d 570) (1987) (citation omitted).

[31] *Howard v. State*, 288 Ga. 741, 745 (3) (707 SE2d 80) (2011) (citations omitted).

[32] *Phillips v. State*, 278 Ga. App. 198, 204 (3) (628 SE2d 631) (2006) (citation omitted).

[33] *Velazquez*, supra at 877 (7).

DECIDED MARCH 16, 2012 —

M. *Katherine Durant*, for appellant.

*Kenneth W. Mauldin, District Attorney, Jon R. Forwood, Assistant District Attorney*, for appellee.