**SECOND DIVISION
BARNES, P. J.,
RICKMAN and SELF, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**March 1, 2017**

# In the Court of Appeals of Georgia

A16A1953. IN THE INTEREST OF L. L., a child.

SELF, Judge.

Thirteen-year-old L. L. was charged in a delinquency petition with aggravated assault with a deadly weapon after the knife he threw at a 15-year-old neighbor lodged in her upper chest, leaving a deep cut.[1] Following a competency hearing, the Dekalb County Juvenile Court found L. L. competent to stand trial. The juvenile court subsequently adjudicated him delinquent and sentenced him to twelve months of probation and completion of the "CAP program." He appeals, arguing that the delinquency should be reversed because the evidence was insufficient to support the juvenile court's finding of competency. We affirm.

---

[1] The victim did not receive treatment by a doctor or stitches.

"It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U. S. 162, 171 (95 SCt 896, 43 LE2d 103) (1975). This principle applies to juvenile proceedings in Georgia. OCGA § 15-11-651. Pursuant to OCGA § 15-11-651, a child may be found "incompetent to proceed" when the child is

> lacking sufficient present ability to understand the nature and object of the proceedings, to comprehend his or her own situation in relation to the proceedings, and to assist his or her attorney in the preparation and presentation of his or her case in all adjudication, disposition, or transfer hearings. Such term shall include consideration of a child's age or immaturity.

OCGA § 15-11-651 (3). See also *Sims v. State*, 279 Ga. 389, 392 (2) (614 SE2d 73) (2005) ("[t]he factors to consider in determining a defendant's capability to assist in his defense include whether the defendant can adequately consult with others, knows the names and functions of those involved with the case, and reasonably understands the rules, the specific charges, the penalties and the consequences of the proceedings"). "The burden of proving that a child is incompetent to proceed shall

be on such child. The standard of proof necessary for proving mental competency shall be a preponderance of the evidence." See OCGA § 15-11-655 (c).

In reviewing L. L.'s challenge to the juvenile court's finding of competency the standard of appellate review is whether, "after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found that the defendant failed to prove by a preponderance of the evidence that he was incompetent to stand trial." *Sims v. State*, supra, 279 Ga. at 391 (1). In this case, L. L.'s court-appointed attorney moved to have him declared incompetent to stand trial and the juvenile court ordered a forensic evaluation. At the competency hearing, L. L. presented the testimony of Dr. Lesley Slone, a licensed clinical psychologist who performed forensic evaluations of juveniles for Georgia Regional Hospital; the assistant public defender appointed at the time of his initial detention; and a social worker employed by the juvenile division of the Dekalb County Public Defender's Office. Dr. Slone filed two reports with the juvenile court: a behavioral health evaluation and a competency evaluation. Dr. Slone testified that she has been a practicing psychologist since 1969, and has completed approximately 3,000 forensic psychological evaluations over her career. Dr. Slone evaluated L. L. on September 8, 2015, using the following tests: the Kaufman Brief Intelligence Test, Second Edition; Wide Range

3

Achievement Test, Fourth Edition ("the WRAT"); Bender Visual-Mouther Gestalt Test; the Million Adolescent Clinical Inventory; and the Juvenile Competency Assessment Procedure, Washington State Revision ("the JCAP"). She explained that she administered tests other than the JCAP to determine if L. L. was "intelligent enough to be able to become competent" and whether he could "think abstractly enough to envision possible situations. . . ." She also administered a personality test. Dr. Slone found L. L. pleasant, but noted that his language skills were poor for his age and that he had difficulty expressing his thoughts clearly and did not request clarification if he did not understand something. In the test for intelligence range, L. L. scored a 71 on the verbal portion, "in the below average range, but not low enough to suggest that he has any kind of intellectual disability." In the non-verbal portion, L. L. scored 85, the lower limit of the average range. The Kaufman Test suggested that L. L.'s IQ was in the below average range. L. L. did not do as well as Dr. Slone expected on the Bender Visual Motor Gestalt Test, but it was "not low enough or poor enough to suggest. . . this child's got a brain injury."

In addition to the intelligence tests, Dr. Slone administered the WRAT which assesses reading, math, and spelling skills. Dr. Slone noted that the reading portion of this test is particularly important because L. L. will be required to read court-

4

provided materials. Dr. Slone determined that L. L. was reading at a third-grade comprehension level.

Dr. Slone also discussed L. L.'s performance on a personality test. She noted that certain factors can affect the test. Specifically, at that time, L. L. appeared insecure and was "feeling vulnerable. He was in the detention center. He was very unhappy and frightened." She noted that he was depressed about being in the detention center and feeling "homesick." Dr. Slone also noted that according to L. L.'s mother, he had been a straight-A student who never got into trouble at school, had never been in a fight, and behaved very well at home until his family moved to Georgia about a year ago. Dr. Slone did not see any signs of serious mental illness or clinical depression, but explained that L. L.'s performance on the personality test shows he is "more likely to let his attorney make all the decisions and not try to get involved, not try to understand how it is going to affect him. Is more likely to answer questions that someone asks him in court and kind of let it all hang out, make comments that are not in his own best interest to make."

Dr. Slone also administered the JCAP, which focuses specifically on competency and helps to assess a child's understanding and appreciation of the charges against him, possible consequences, the nature of court proceedings, the roles

of the different players in court, the different personnel, and whether a child can apply his rights to his own situation and assist his attorney in preparing and presenting a defense. Dr. Slone examined each of these factors in her testimony and report.

(i) *Appreciation of Charges or Allegations.* Dr. Slone testified that L. L. did not initially recall the charges against him, but once it was read to him, he was able to recall it, defining aggravated assault as "when you damage a human." Dr. Slone further testified that L. L. knew what he had been accused of doing, which is "the urgent part. I don't care if the child knows the actual words, but if they understand. . . what did the police accuse you of doing, that's what they have to know." He also reasonably understood the severity of the aggravated assault charge and correctly stated that his charge is more serious than breaking a window because the victim could "get very injured," but less serious than killing someone. Initially, L. L. did not understand the difference between a misdemeanor and a felony, but was able to understand and retain the difference as explained by Dr. Slone. When asked if he was in "a lot," "a medium," or "a little" amount of trouble, L. L. chose "a little because the judge was trying to let me out on house arrest and probation."

(ii) *Appreciation of the Range/Nature of Possible Penalties.* Dr. Slone testified that L. L. explained that courts punish people "so they can learn their lesson and

never make the mistake again." L. L. identified possible punishments as house arrest, unspecified programs, group home, and boot camp. He thought house arrest would be the worst punishment he could get "because you can't go outside"; probation, the best. But, according to Dr. Slone, "he simply didn't know enough about the options to know which is worse." L. L. stated that the judge would give him a fair punishment "so he can learn," but persisted in believing, despite Dr. Slone's correcting him, that even if the judge did not find him delinquent, she could still punish him "if she believed it would teach [him] a lesson and keep him from getting into trouble in the future."

(iii) *Understanding of the Adversarial Nature of the Legal Proceedings*. L. L. had no knowledge of his legal rights and Dr. Slone had to explain what it means to have the "right to remain silent." While L. L. retained knowledge of his right to remain silent, he believed that he had to respond to the judge's questions regardless of whether his responses damaged his case. L. L. described the roles and responsibilities of courtroom personnel, stating that the prosecutor's job was to convince the judge he was guilty, and "try to keep him in jail"; that his attorney's job was to help him and try to keep him out of jail; and that the judge's job was to be impartial and decide his punishment, but that he did not expect her to treat him fairly.

7

L. L. explained that witnesses are on "nobody's side" but he was worried that one witness to the incident would lie because he was better friends with the victim.

Dr. Slone determined that L. L. seemed not to understand the concept of pleas or plea bargaining. L. L. stated that a guilty plea "[m]eans you did it" and would have an opportunity to tell the judge your side of the story and that a not-guilty plea means "you still have a chance. They find you not guilty." In her report, Dr. Slone noted that L. L. "persisted in believing that if the defendant committed the crime, he or she could not plead 'not guilty.'" When Dr. Slone explained to L. L. the process of plea bargaining, he paraphrased the information given to him as follows: "[the prosecutor] don't have enough evidence to find you guilty, so she gonna try to make a deal, probation, house arrest or you might have to do couple months." L. L. would consider his attorney's recommendations of a fair plea deal even if he did not understand them, but recognized that he is not bound by his attorney's advice. He could not remember any of the rights he would give up if he accepted a plea offer.

(iv) *Capacity to Identify and Disclose Pertinent Facts.* L. L. believed that anything he told his attorney would be kept "secret" and that he plans to tell his attorney everything about what happened. Dr. Slone reported that L. L.'s account of the incident was vague and confusing, but that it improved in response to direct

questioning. When given a hypothetical case and offered three pairs of new facts about the defendant and the events, L. L. was able to correctly identify information relevant to the defense.

(v) *Capacity to Testify Relevantly*. L. L. understood that he did not have to testify, but that if he chose to, he must tell truth. He told Dr. Slone that if the district attorney asked him a question which could "get [him] in trouble if [he] told the truth," he would rather not say anything "than tell a lie." However, he added that if the judge asks him a question and he is afraid he will get in trouble if he tells the truth, he would still tell the truth and that he wants the judge to let him "go with a punishment." When asked the hardest part about testifying, L. L. responded that it would be " the DA telling me I'm found guilty. How can I prove that I'm found guilty." Dr. Slone was concerned that L. L. thought he needed to prove that he is found guilty and concluded that L. L. did not grasp the information well enough to explain himself.

(vi) *Ability to Manifest Appropriate Courtroom Behavior and Tracking of Proceedings*. L. L. understood that he was supposed to behave "presentabl[y]" in court, not talk when the judge is talking, stand up when the judge asks, and pay attention to the proceedings, including witness testimony. Dr. Slone testified that L.

L. was capable of paying attention in the courtroom, but she noted that "he didn't understand that when the judge asks you to stand up, that you are not being asked to tell the whole story of your life, that you are responding to specific questions."

(vii) *Diagnosis/Conclusion*. Dr. Slone diagnosed L. L. with an adjustment disorder because L. L.

> was a well-functioning kid picked up out of a calm middle class social environment and dropped into an area full of disorganization, community disorganization, violence, drugs, and it was just culture shock. I think it was probably very frightening to him, very lonely, because none of the rules he has learned on how you get along with kids, how you interact with people and with adults, those don't work the same in this environment that they get there.

According to L. L.'s mother, he was a "'straight-A student' who never got into trouble at school, had never been in a fight, and behaved very well at home" until the family moved to Georgia from Florida a year before. Dr. Slone found no evidence of mental illness or attention disorders. Dr. Slone noted that at the time of the evaluation, L. L. was "homesick, anxious and unhappy, to the point of tears. He reported having nightmares about family members getting killed."

Dr. Slone stated throughout her testimony and in her report that L. L. had trouble expressing his thoughts clearly and would not ask for clarification if he did

not understand something; he was trying to do his best during the interview and did not want to offend Dr. Slone. Based on the factors discussed above, Dr. Slone opined that L. L. was incompetent to stand trial. Of particular concern to Dr. Slone was that L. L. does not "have an adequate rational appreciation of the nature of the proceedings against him or his own role in those proceedings" and that he has difficulty understanding his plea options and the plea bargaining process.

Michelle Gopman, an assistant public defender with the Dekalb County Juvenile Court, also testified on behalf of L. L. Gropman testified that she was assigned to handle L. L.'s initial detention case and that during her first meeting with him, she knew immediately that he was inarticulate and that his cognitive function was below the level of a thirteen-year-old. At that time, Gropman suspected that she would file an incompetency request. Gropman also testified that L. L.'s version of the events that resulted in his detention was somewhere between unrealistic and fantastical; that he did not understand the juvenile court legal process; that he did not understand the concept of probation ("probation is something that happens to him when he's found not guilty"); that he did not think he had a choice about testifying; that he believed detention and trial were synonymous; and that the judicial process was very one sided, because he stated that "there was no getting off for him."

11

Kimberly Burke, a social worker with the juvenile division of the Dekalb County Public Defender's Office, also testified on L. L.'s behalf. She explained that she first met L. L. when Gropman explained that she had concerns about L. L.'s competency and asked Burke to attend a meeting with the child. Burke believed that a competency evaluation was warranted for the following reasons: L. L. could not articulate the roles and responsibilities of court personnel, though he stated that the public defender's job was to help him and the prosecutor's role was to put him in jail; he did not understand the juvenile court process; he did not understand his rights; he did not understand the concept of a plea bargain; he was unable to articulate an understanding of probation; he could not articulate the difference between a felony and misdemeanor; he believed he had to testify and if he refused, he would automatically go to detention ; and his recollection of the events that led to his arrest, were "fantasy like. . . [not] reality based."

After considering the testimony and Dr. Slone's written report, the juvenile court ruled that L. L. was competent to stand trial. The juvenile court rejected Dr. Slone's assessment that L. L. did not understand juvenile court proceedings, finding that "a child's inability to initially grasp legal jargon[, i.e., felony and misdemeanor,] does not go to a child's incompetence. . . [as] there are probably many children, as

12

well as many adults, who are very unfamiliar with such legal jargon." The court found that the following factors weighed in favor of competence: (1) L. L. had a good understanding of possible penalties and the role of court personnel; (2) he gave appropriate responses to the legal hypotheticals presented to him by Dr. Slone; and (3) he articulated the importance of proper courtroom demeanor. In its oral ruling, the juvenile court took issue with several of Dr. Slone's conclusions as follows:

> [Dr. Slone] stated that even if [L. L.] was found not to have committed the offense, he still believe[d] that the judge could punish him or teach him a lesson to keep him from getting into trouble again. From a child's perspective, I don't think that that is altogether incorrect in the sense that I think from a child's perspective he realize[s] that even if he were found not guilty of the charge, the judge could still lecture him about if the judge, as he said, believed he really did it, about not getting into trouble in the future. So I thought that was a fairly reasonable assessment on the part of a 13[-]year[-]old. Furthermore, [Dr. Slone stated] that the child persisted in believing that if he pled guilty he would still have an opportunity to tell the judge his side of the story, and the evaluator thought that was correct. But again, I don't think that is an unreasonable presumption of a 13[-]year[-]old child who has had some experience with the juvenile court system because even if he did plead guilty, he would have to tell his side of the story to some extent. Furthermore, [Dr. Slone] stated that the child persisted in believing that if the defendant committed the crime he or she should not plead[,] could not plead[,] not guilty. . . . [O]ne of the reasons [Dr. Slone] says the

13

child is incompetent was because he adamantly believed that if he committed the crime he could not plead not guilty. But to me that goes to this particular child's own personal moral code or ethical code. Just because you explain to a child that he has a right to plead not guilty that doesn't mean that a child really internalizes that particularly if he believes and knows he committed the crime. . . [L. L.'s] insistence on not being able to plead not guilty if he committed the crime. . . goes to his own ethical code not an inability to understand the legal process.

L. L. contends that the preponderance of the evidence established that he was incompetent to stand trial as defined by OCGA § 15-11-651, and that subjecting him to a delinquency hearing violated his due process rights. L. L. takes issue with the trial court's rulings on each factor provided in OCGA § 15-11-651. Before we address each factor, it is important to set forth the basic principles applicable to competency proceedings.

"The purpose of a competency hearing is to determine the mental ability of the defendant, at the time of trial, to intelligently participate in his or her trial." (Citation omitted.) *Almond v. State*, 180 Ga. App. 475, 477 (1) (349 SE2d 482) (1986). In making this determination, the trier of fact resolves conflicts in the testimony and weighs the evidence. See *Tiegreen v. State*, 314 Ga. App. 860, 867 (1) (726 SE2d 468) (2012). Cf. *Nagel v. State*, 262 Ga. 888, 891 (427 SE2d 490) (1993) (in hearing

14

on defendant's application for release after he was committed on grounds of insanity, fact-finder must balance expert medical evidence against presumption of insanity and may not simply disregard expert medical evidence and rely solely on presumption)."[D]ecisions regarding credibility are uniquely the province of the [factfinder], which [is] not required to accept the testimony of [the defendant's] witnesses. . . . " *Tiegreen v. State*, supra, 314 Ga. App. at 867 (1). Compare *Wallace v. Kemp*, 757 F2d 1102 (11th Cir. 1985) ("when the expert testimony clearly and overwhelmingly points to a conclusion of incompetency, the [trier of fact] cannot arbitrarily ignore the experts in favor of the observations of laymen"; in this case, jury improperly disregarded three expert opinions that defendant was incompetent to stand trial). As discussed above, there is a rebuttable presumption that the defendant is competent to stand to trial. Although Dr. Slone opined that L. L. was incompetent to stand trial, the juvenile court found that her testimony and report failed to rebut this presumption. The court concluded that Dr. Slone's evidence was insufficient to prove, by a preponderance of the evidence, that L. L. was incompetent to stand trial and, for the reasons that follow, we agree.

1. L. L. claims that he lacked sufficient present ability to understand the nature and object of the proceedings. This claim rests primarily on L. L.'s low IQ and Burke

and Slone's testimony that L. L. did not understand how court personnel interacted with each other and could not grasp the process of plea bargaining, particularly any of the rights he would be giving up if he accepted a plea offer. With the reading comprehension of a third grader and a below-average IQ, L. L. contends that his comprehension of the legal process was "woefully lacking."

A defendant's below average IQ is not determinative of his ability to stand trial. See *Tye v. State*, 298 Ga. 474, 478 (2) (a) (782 SE2d 10) (2016); *Sims v. State*, supra, 279 Ga. at 393 (2). Rather, "[t]he constitutional test for competency is whether the defendant is capable of understanding the nature and object of the proceedings, comprehends his own condition in reference to such proceedings, and is capable of rendering his counsel assistance in providing a proper defense." (Punctuation omitted.) *Slaughter v. State*, 292 Ga. 573, 578 (4) (740 SE2d 119) (2013), citing *Sims v. State*, supra, 279 Ga. at 390.

L. L. points to his initial detention hearing where the juvenile court discovered that he lied to his attorney as evidence that he did not understand counsel's duty of confidentiality.[2] The record, however, does not support the conclusion L. L. did not

---

[2] During that hearing, L. L.'s attorney supported her request for his release by explaining that he never gets into trouble at school and is a straight-A student. L. L.'s mother disputed this, advising the court that L. L. does nothing at school, that he

16

understand is attorney's duty of confidentiality. According to Dr. Slone's report and testimony, L. L. showed an appreciation for confidential communications with his attorney. Additionally, L. L. possessed a reasonable grasp of the juvenile court process, correctly explaining the roles of the prosecutor, his attorney, the judge, and witnesses. He also acknowledged that he could remain silent when questioned by the prosecutor, and advised that he would tell his attorney the truth about what happened.

---

comes home at six in the morning or sometimes leaves home for two or three days at a time, and that his behavior is challenging and disrespectful. The court asked how L. L. is "managing to be a straight-A student" given his behavior and L. L.'s mother replied, "[t]hat's what he told [his attorney]." The court then asked L. L., "[s]o, is what you told your lawyer is that the truth that you're a straight-A student? You are[,] is he a straight-A student?" L. L.'s mother replied, "[s]traight zeros." The court then reprimanded L. L.:

> So do you understand that you're coming up in here telling the person who - - who sits between detention and freedom and you're lying to her. I'm not talking about your mom, I'm talking about your lawyer. You know if you're going to tell the truth to anybody, you need to tell it to your lawyer because she tells the court and court is trying to make a decision, and now I can't trust anything that she says.

> Not because she's a bad person, it's because you are a liar. Your mom comes in here to say that you are a zero student. And I don't believe your mama has any reason to come in here and make such a false statement.

While L. L. had some difficulty understanding the particulars of plea bargaining, he knew the difference between a guilty plea and a not-guilty plea and was able to retain Dr. Slone's explanation of the process. Most importantly, he recognized that he could consult with his attorney about a fair plea deal. OCGA § 15-11-651 does not require a comprehensive understanding of the details of plea bargaining; it requires that a juvenile defendant be able to assist in his own defense. Cf. *Slaughter v. State*, 292 Ga. 573 (740 SE2d 119) (2013) (affirming finding that defendant was competent to stand trial where preponderance of the evidence showed that defendant knew the names and functions of those involved in the trial process, could recall and relate facts pertaining to his actions and whereabouts at the time of the crime, and knew what was expected of him at trial, what the charges against him were, and the potential sentence he faced if convicted).

2. L. L. next contends that he lacked sufficient present ability to comprehend his own situation in relation to the proceedings. In support of this contention, L. L. points out that he could not articulate the difference between a felony and a misdemeanor; that he believed that he was in a "little" amount of trouble when in fact he was charged with a "Class A Designated Felony"; and that he was confused by his plea options. Dr. Slone's report and testimony demonstrated that L. L. was able to

18

articulate the possible penalties available to the court if he were found guilty, including detention (you "might have to do couple months"), house arrest, and probation. The evidence also indicated that L. L. was aware of the conduct that occasioned the charge and recognized the severity of that conduct, confirming that he was charged with something more serious than breaking a window but less serious than murder. He also grasped the difference between pleading "guilty" or "not-guilty," explaining that pleading guilty "means you did it," and pleading not guilty means "you still have a chance[;] they [can] find you not guilty." The preponderance of the evidence supported the trial court's finding that L. L. had sufficient present ability to comprehend his own situation in relation to the proceedings.

3. L. L. further contends that he lacked sufficient present ability to assist his attorney in the preparation and presentation of his case in all adjudication, disposition, or transfer hearings. Again, L. L. points to his misunderstandings about the plea bargaining process and his legal rights, specifically his right to remain silent. We addressed the process of plea bargaining above. As for L. L.'s understanding of his legal rights, while there is evidence that he showed some initial confusion, there is also evidence that he later understood he was not required to testify or answer questions posed by the prosecutor if his answers were incriminating.

19

There was ample evidence of L. L.'s ability to assist in his defense. Testimony showed that L. L. could recount for his attorney the facts underlying the charge and that he planned to tell his attorney everything about the incident. While there was some testimony that L. L.'s version of the incident was "unrealistic and fantastical," L. L. presented no evidence explaining this characterization of his recollection or how it would hinder his ability to assist his attorney. Moreover, Dr. Slone noted that L. L.'s account of the incident improved with questioning. Accordingly, the juvenile court was authorized to discount this evidence and place more weight on Dr. Slone's finding that L. L. correctly answered three hypothetical questions posed by Dr. Slone, showing that he appreciated the factors relevant to putting forth a meaningful defense.

4. L. L. asserts that the juvenile court incorrectly based its ruling on evidence not presented in the hearing. In this regard, L. L. contends that (1) the court misrepresented "L. L.'s deficits as more simplistic than what was established by the evidence" and incorrectly dismissed them as merely "a child's inability to grasp legal jargon" and (2) the trial court discounted L. L.'s "dangerously inaccurate and deficient understanding[s]" of the legal process by characterizing them incorrectly as "reasonable assessments on the part of a" teenager or relating to the child's moral or ethical code. "In this case, the trial judge did what factfinders do in every case and

20

applied [her] own life experiences and knowledge to the evidence at hand." *Larsen v. State*, 253 Ga. App. 196, 198 (2) (558 SE2d 418) (2001).

5. Finally, in a related argument, L. L. contends that the juvenile court erred by arbitrarily and summarily ignoring Dr. Slone's overwhelming opinion evidence that L. L. was incompetent to stand trial. In support of this argument, L. L. relies on *Nagle*, supra, *Wallace*, supra, and *Strickland v. Francis*, 738 F2d 1542 (11th Cir. 1984). In addressing the defendant's competence to stand trial, the court in *Strickland* stated that

> [i]t is well established that a factfinder need not adhere to an expert opinion on incompetency if there is reason to discount it. However, where, as here, the expert testimony so clearly and overwhelmingly points to a conclusion of incompetency, the [factfinder] cannot arbitrarily ignore the experts in favor of the observations of laymen.

(Citations and punctuation omitted.) *Strickland*, supra at 1152 (III) (B). In assessing whether the defendant in *Strickland* was faking his mental illness the court considered four factors "that reasonably could lead a factfinder to disregard expert testimony on the defendant's mental condition." Id. The four factors are:

> (1) the correctness or adequacy of the factual assumptions on which the expert opinion is based; (2) possible bias in the experts' appraisal of the defendant's condition; (3) inconsistencies in the expert's testimony, or

21

material variations between experts; and (4) the relevance and strength of the contrary lay testimony.

(Citation and punctuation omitted.) Id. In *Keener v. State*, 254 Ga. 699 (334 SE2d 175) (1985), our Supreme Court took note of these factors in affirming a jury's finding that the defendant was guilty of murder but mentally ill. Id. at 701, n. 4. The Court noted that factors (1) and (4) were present in *Keener*, making it reasonable for the factfinder to disregard the expert testimony. Id.

To the extent the *Strickland* factors apply in this case, we find that it was reasonable for the juvenile court to disregard Dr. Slone's conclusion that L. L. was incompetent to stand trial based on the first factor. Dr. Slone ultimately determined that L. L. was incompetent to stand trial because she did not believe that he had an adequate rational appreciation of the nature of the proceedings against him or of his own role in those proceedings, and she was concerned about his ability to adequately track and comprehend witness testimony and to testify without incriminating himself. However, the factual assumptions underlying Dr. Slone's ultimate conclusion of incompetency were inadequate to support that conclusion. Those factual assumptions included that L. L. had difficulty understanding his plea options and the particulars of the plea bargaining process, that he did not understand the difference between a

felony and a misdemeanor, that he would tell the judge the truth if asked a question, and that his account of the incident was vague and confusing. Dr. Slone's ultimate conclusion relied upon these inadequate factual assumptions, while diminishing factors that go to the very heart of whether a juvenile defendant is capable of assisting in his own defense. In particular, according to Dr. Slone, L. L. understood what he had been accused of doing, which in her mind was the most "urgent" part of assessing his appreciation of the charges and allegations against him. He also appreciated the severity of the charge; correctly described the roles of and responsibilities of courtroom personnel; understood courtroom decorum; understood that he did not have to testify; planned to tell his attorney everything about the incident; and was able to identify possible punishments. He further understood that his discussions with his attorney are confidential and, most notably, he correctly answered three hypothetical questions posed by Dr. Slone, showing that he appreciated the factors relevant to putting forth a meaningful defense. All of these factors support the trial court's finding of competency.

In this case, the factual assumptions upon which Dr. Slone relied in reaching her ultimate opinion were inadequate to support a conclusion of incompetency.

Accordingly, the juvenile court did not err in taking exception to the opinion and finding L. L. competent to stand trial.

*Judgment affirmed. Barnes, P. J., and Rickman, J., concur*.