**FOURTH DIVISION**
**MERCIER, C. J.,**
**DILLARD, P. J., and LAND, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**May 15, 2025**

# In the Court of Appeals of Georgia

A25A0234. STALEY v. THE STATE.

DILLARD, Presiding Judge.

Desmond Staley appeals his convictions for armed robbery, aggravated assault, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon. Staley argues (1) the trial court erred by failing to order a competency evaluation or hold a hearing on the matter; (2) the trial court abused its discretion by admitting evidence of his prior convictions; (3) he received ineffective assistance of counsel when his counsel did not move to suppress illegally obtained evidence and an impermissibly suggestive photographic lineup; (4) the trial court abused its discretion in allowing the victim to testify about the gun used in the

robbery; and (5) the cumulative prejudicial effect of these errors warrants a new trial. For the following reasons, we affirm.[1]

Viewed in the light most favorable to the jury's guilty verdict,[2] the record shows that on September 17, 2014, Jose Trejo[3] drove to an apartment complex with two friends after work. Once there, Trejo exited the car, leaned on the driver's side door, and began speaking with some friends when he observed a car stop nearby and a person exit that vehicle. The person—later identified as Staley—walked toward Trejo and his friends and asked if they had a cigarette. But almost immediately, Staley pulled out a gun, cocked it, pressed it against Trejo's stomach, and demanded that Trejo give him everything in his possession. Staley then began searching through Trejo's pockets with the gun still pressed up against his stomach. Staley stole Trejo's wallet and some

---

[1] Oral argument was held on January 16, 2025, and is archived on the Court of Appeals of the State of Georgia's website. *See* Court of Appeals of Georgia, Oral Argument, Case No. A25A0234. (Jan. 16, 2022), available https://vimeo.com/1047910435.

[2] *See, e.g.*, *Roundtree v. State*, 358 Ga. App. 140, 141 (854 SE2d 340) (2021).

[3] Throughout the record, Trejo's name is occasionally spelled "Trejos," but because at trial he spelled his name as "T-R-E-J-O," we do so as well.

cash from his pockets, as well as his friends' wallets and cellphones. And after doing so, Staley "walked off and got in his car and took off like nothing had happened."

Trejo called 911 and—while speaking with the operator—followed Staley's vehicle to obtain his license-plate number. Trejo noticed that Staley was driving a Dodge, but he could not tell which model. Trejo was also able to see Staley's license plate, and he read it to the 911 operator. Trejo then returned to the apartment complex, and police officers had arrived on the scene. But at this point, his friends had not spoken to the officers because they were afraid and "didn't want any trouble." Trejo did speak to the police. He told them there was "a lot of light" in the parking lot during the robbery, and that he could see Staley's face because he was only a foot away and nothing was covering it. Trejo also noted the robbery lasted for around two minutes, and that Staley was tall and had tattoos covering his neck.

Then, on September 20, 2014 (three days after the robbery), Officer J. Q. Kelley with the DeKalb County Police Department responded to a 911 call indicating that a woman was being held against her will in a hotel room. Once at the hotel, Kelley attempted to make contact with anyone in the room. Initially, Kelley was the only law-enforcement officer on the scene, but two other officers arrived shortly after he did.

And when the officers knocked on the door of the room, a man answered but would not allow the officers inside. But because of the 911 call, the officers believed there were exigent circumstances justifying their immediate access into the room. In other words, because there was reason to believe a woman was in immediate danger, it was legal for them to gain entry into the room without a warrant. As a result, the officers quickly obtained a room key from the hotel's front desk clerk.

Using the key, the officers entered the hotel room and discovered three men and one woman. The officers then investigated the 911 call, and determined the woman was safe. The officers obtained the names of the room's occupants—one of which was Staley—to run through a national database to determine whether they had any "outstanding warrants, convictions, or any other things in regards to these particular subject[s]."

While at the hotel, Officer Kelley observed two vehicles parked directly in front of the hotel room, including a newer model of a silver Dodge Dart. Kelley asked Staley if the Dodge Dart belonged to him, and he denied owning it. And when asked how he arrived at the hotel, Staley stated that he was "dropped off by an unknown [individual]." Kelley then asked to search everyone in the room, including Staley, who

consented to it. In searching Staley, Kelley found a pair of car keys in his pocket; and when he pressed the key fob, it unlocked the Dodge. Kelley later called dispatch to run the car's license-plate number, and he learned it was a rental car.

Despite possessing the keys to the car, Staley continued to deny that he owned or had driven it. So, because the car appeared to have been abandoned, the officers did an investigatory search of the vehicle. And in doing so, they discovered a black handgun in the floorboard slightly under the driver's seat and a car-rental agreement in the glove compartment, indicating that Daniella Staley[4] rented it. According to Kelley, the gun was only accessible to the driver. Then, after the officers discovered (by the serial number) that the gun was stolen, they arrested Staley for possession of a stolen firearm.

Again, because the Dodge Dart was ostensibly abandoned, police impounded it, and a detective investigated the situation. This investigation revealed that the license-plate number Trejo gave to the 911 operator following the robbery—PNA7181—matched the license-plate number on the rented Dodge. The detective also found it notable that a stolen gun was recovered from the Dodge parked

---

[4] Officer Kelley asked Staley if he knew Daniella, and he did not respond. From the parties' briefs, it appears undisputed that she is Staley's mother.

5

directly in front of Staley's hotel room only three days after the robbery and Staley was in possession of its keys when he was taken into custody. Finally, the gun recovered from the car matched Trejo's description of the firearm used in the robbery (*i.e.*, a black handgun).

The detective then compiled a photographic lineup in which he attempted to select individuals with the same skin tone, almost the same hairstyle, and similar facial features as Staley. And according to the detective, in Staley's photograph, you could "see there is something on his neck[,] . . . you can't make out what kind of tattoo [it is][,] or even if it is a tattoo." The detective found it "hard" to locate other individuals who looked like Staley and also had similar tattoos; and ultimately, Staley was the only individual in the lineup who had tattoos. Later on, a different police officer—who did not know Staley was the subject of the lineup—showed it to Trejo, who selected Staley as his attacker.

Ultimately, Staley was charged (via indictment) with armed robbery, aggravated assault, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon. And following a jury trial, Staley was convicted of all

charged offenses. Staley then filed a motion for a new trial, which the trial court denied after holding a hearing. This appeal follows.

1. Staley first argues the trial court erred in failing to hold a hearing on whether he was competent to stand trial. We disagree.

As explained by the Supreme Court of the United States, "[i]t has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."[5] But the threshold for competency is "easily met in most cases; it exists so long as a defendant is capable at the time of the trial of understanding the nature and object of the proceedings going on against him and rightly comprehends his own condition in reference to such proceedings."[6] Importantly, the factors to consider in determining a defendant's competency include whether he or she can "adequately consult with others, knows the names and functions of those involved with the case, and reasonably

---

[5] *Drope v. Missouri*, 420 U.S. 162, 171 (II) (95 SCt 896, 43 LE2d 103) (1975); *accord Biggs v. State*, 281 Ga. 627, 629 (3) (642 SE2d 74) (2007).

[6] *Sims v. State*, 279 Ga. 389, 392 (2) (614 SE2d 73) (2005) (punctuation omitted); *accord Traylor v. State*, 280 Ga. 400, 406 (4) (b) (627 SE2d 594) (2006).

understands the rules, the specific charges, the penalties and the consequences of the proceedings."[7]

Before diving into the merits, we must briefly address the State's contention that Staley waived this claim of error by failing to raise the issue of competency in the trial court. And to be sure, the State is correct that Staley neglected to do so. But that is not the end of our analysis. Generally, issues and objections not raised in the trial court and ruled on by that court are "deemed waived and cannot be raised for the first time on appeal."[8] This requirement, however, does not apply when the trial court has reason to believe the defendant lacks competency to stand trial. Indeed, when information becomes known "sufficient to raise a bona fide doubt regarding the accused's mental competency to stand trial, the court has a duty, *sua sponte*, to inquire

---

[7] *Sims*, 279 Ga. at 392 (2) (punctuation omitted); *accord Tiegreen v. State*, 314 Ga. App. 860, 868 (2) (726 SE2d 468) (2012).

[8] *Champion Windows of Chattanooga v. Edwards*, 326 Ga. App. 232, 242 (2) n.9 (756 SE2d 314) (2014) (punctuation omitted); *see State v. Fed. Def. Program, Inc.*, 315 Ga. 319, 343 (3) (f) (882 SE2d 257) (2022) ("Because fairness to the trial court and to the parties demands that legal issues be asserted in the trial court, absent special circumstances, an appellate court need not consider arguments raised for the first time on appeal." (punctuation omitted)).

into the accused's mental competency to stand trial."[9] So, under these circumstances, even when a defendant's counsel does not file a plea of mental incompetence, "constitutional guarantees require the trial court to inquire into competency, *even where state procedures for raising competency are not followed*, if evidence of incompetence comes to the court's attention."[10] Thus, if the trial court possessed information sufficient to raise a bona fide doubt regarding Staley's competency to stand trial, it was required to *sua sponte* hold a competency hearing, and Staley has not waived a challenge to the trial court's failure to do so.[11]

---

[9] OCGA § 17-7-129 (a) (emphasis supplied); *see Biggs*, 281 Ga. at 629-30 (3) ("A trial court has the sua sponte duty to inquire into a defendant's competency only when information becomes known to it, prior to or at the time of the trial, sufficient to raise a bona fide doubt regarding the defendant's competence."); *Cosby v. State*, 365 Ga. App. 574, 578 (2) (879 SE2d 671) (2022) (same).

[10] *Phelps v. State*, 296 Ga. App. 362, 364 (1) (674 SE2d 620) (2009) (punctuation omitted) (emphasis supplied); *accord Baker v. State*, 250 Ga. 187, 190 (1) (297 SE2d 9) (1982).

[11] *See Biggs*, 281 Ga. at 629-30 (3) (explaining that "[a]n accused who lacks the mental capacity to understand the nature and object of the proceedings around him, to consult with counsel, and to assist in preparing his defense, may not constitutionally be subjected to trial. A trial court has the sua sponte duty to inquire into a defendant's competency only when information becomes known to it, prior to or at the time of the trial, sufficient to raise a bona fide doubt regarding the defendant's competence" (punctuation and citation omitted); *Cosby*, 365 Ga. App. at 578-79 (2) ("A trial court has the sua sponte duty to inquire into a defendant's competency only

Turning back to the merits, we first consider Staley's claim that his conduct during the *Faretta*[12] hearing below shows the trial court erred in not recognizing that he lacked the competence to stand trial. And in doing so, Staley accurately describes those proceedings. Indeed, during that hearing, he consistently provided nonresponsive answers to the court's questions about self representation, and most

when information becomes known to it, prior to or at the time of the trial, sufficient to raise a bona fide doubt regarding the defendant's competence. The salient question is whether the trial court received information which, objectively considered, should reasonably have raised a doubt about the defendant's competency and alerted the trial court to the possibility that the defendant could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense. (punctuation and citations omitted). *Cf. Lytle v. State*, 290 Ga. 177, 179 (3) (718 SE2d 296) (2011) (holding that trial court did not have duty to *sua sponte* inquire into defendant's competency when he "did not present any information to the trial court that should reasonably have raised a doubt about his competency and alerted the trial court to the possibility that he could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense" ).

[12] *See Faretta v. California*, 422 U.S. 806, 835-36 (V) (95 SCt 2525, 45 LE2d 562) (1975) (holding that if a defendant makes a pre-trial, unequivocal assertion of the right to self-representation, the request must be followed by a hearing to ensure the defendant knowingly and intelligently waives the "traditional benefits associated with the right to counsel" and understands the "disadvantages of self-representation so that the record will establish that he knows what he is doing and his choice is made with eyes open" (punctuation omitted)); *Wiggins v. State*, 298 Ga. 366, 370 (2) (782 SE2d 31) (2016) (reversing the defendant's convictions when he "unequivocally asserted his right to self-representation and that his request to proceed pro se was implicitly denied by the trial court without a *Faretta* hearing").

of what he said was rambling and incoherent. For example, during his colloquy with the court, Staley stated more than once that he did not understand "the nature and cause of the charges." But eventually, when Staley continued to respond with nonsensical diatribes, the court requested that the record "reflect the defendant [has] refused to answer the question."

When the trial court asked Staley if he fully understood everything it explained to him, Staley responded, "Judge, can you provide proof of claim that a state constitution operates upon me by and through the state legislature and through the state statutes?" This was a common refrain of Staley during the hearing—that he is not subject to the jurisdiction of courts, which is often called the "sovereign-citizen defense."[13]

---

[13] The "sovereign citizen defense" is one in which "an individual claims that he or she is not subject to the jurisdiction of courts and government agencies, alleging that the government is illegitimate, and it is a defense that has no conceivable validity in American law." *Morman v. State*, 356 Ga. App. 685, 686 n.2 (848 SE2d 165) (2020) (punctuation omitted); *see Brown v. State*, 346 Ga. App. 245, 247 (4) (816 SE2d 111) (2018) ("Defendants claiming to be 'sovereign citizens' assert that the government is illegitimate and insist that they are not subject to its jurisdiction. The defense has no conceivable validity in American law. Courts have repeatedly rejected such theories of individual sovereignty, immunity from prosecution, and their ilk. Regardless of an individual's claimed status of descent as a 'sovereign citizen,' that person is not beyond the jurisdiction of the courts. These theories should be rejected summarily, however they are presented." (punctuation omitted)).

At the conclusion of the hearing, the trial court orally found the following:

> Okay, I cannot find that the defendant is making a knowing, intelligent, and voluntary waiver of his constitutional right to counsel.

> I cannot find that he fully understands what he is doing . . . . Therefore I am denying him the right to represent himself in this case . . . .

> When I asked him if he understood the charges, he said he does not understand the nature of the charges.

> He said that once in response to the clear question after I read the indictment as to whether or not he understood the nature of the charges against him.

> And he repeated that statement, I think a couple of other times . . . . So, I'm going to deny the request for self-representation in this case.

In considering this matter, we set aside the question of whether the trial court should have held a pre-trial competency hearing after concluding at the *Faretta* hearing that Staley did not understand—at least at that time—the nature of the charges against him. Instead, our *sole* concern is whether the court had reason to believe Staley was incompetent *at the time of trial.* And again, the threshold for competency is easily met in most cases. It exists so long as the defendant is "*capable*

*at the time of the trial* of understanding the nature and object of the proceedings going on against him and rightly comprehends his own condition in reference to such proceedings."[14] And crucially, Staley gave *no* indication *at trial* that he was incompetent or failed to understand the nature of the charges against him.

To the contrary, at trial, Staley clearly expressed his continued desire to represent himself, stating that he did not consent to being represented by his then-current attorney. And when the trial court asked Staley specific questions about his request to represent himself, he answered them appropriately, succinctly, and coherently. He made no outbursts, nonsensical diatribes, or even requests to speak

---

[14] *Sims*, 279 Ga. at 392 (2) (punctuation omitted) (emphasis supplied); *see United States v. Edmonson*, 850 F.App'x 748, 758 (11th Cir. 2021) ("In determining whether there was a bona fide doubt as to competency, we consider three factors: (1) evidence of the defendant's irrational behavior; (2) his demeanor *at trial*; and (3) any prior medical opinion on his competence to stand trial." (punctuation omitted) (emphasis supplied)); *Traylor*, 280 Ga. at 404 (4) (a) (same); *see also Palmer v. State,* 303 Ga. 810, 813-14 (II) (814 SE2d 718) (2018) (holding that "[b]ecause [the defendant] has failed to show the type of behavior or demeanor *at trial* that would reasonably raise a bona fide question about his competence, and because the only medical opinion in evidence indicates that [the defendant] was competent to stand trial, [his] competency argument fails" (emphasis supplied)); *Norris v. State*, 250 Ga. 38, 41-42 (3) (295 SE2d 321) (1982) (explaining that "evidence of a defendant's irrational behavior, his demeanor *at trial*, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient" (emphasis supplied)).

while the court and attorneys discussed preliminary matters. Also, when the State detailed a plea it was willing to offer Staley, his counsel asked for time to consult him on the matter. The court then granted a recess for Staley's counsel to do so.

After defense counsel spoke with Staley, he stated that his client wanted to know what sentence the trial court would impose if he pleaded guilty. Staley also told his counsel that, when he was represented by a prior attorney, he was "not aware of any plea offer being on the table." Then, after the court answered Staley's question, he consulted defense counsel a second time off the record. But ultimately, Staley proceeded to trial.

Staley gave no indication, then, at the time of trial that he might not be competent to proceed. He gave clear and appropriate answers to the trial court's questions. He was also able to ask coherent questions through his counsel, effectively consult his counsel about a plea deal, and make a seemingly knowledgeable decision to reject it. And after consulting Staley, defense counsel never suggested to the court that his client was unable to understand their discussions or to make informed decisions. As a result, no matter his condition before trial, Staley appeared to be fully

14

competent to stand trial when he did so.[15] As a result, the court was not obligated to *sua sponte* hold a hearing on the matter.[16]

2. Next, Staley contends the trial court abused its discretion by admitting evidence of his prior convictions. Again, we disagree.

OCGA § 24-4-404 (b) ("Rule 404 (b)") provides, *inter alia*, that

[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including,

---

[15] Staley's argument on appeal regarding competency focuses solely on his behavior, demeanor, and statements made during *pre-trial* proceedings. But he has not identified any place in the *trial* transcript where his behavior, statements, or demeanor suggested he might not be competent to stand trial.

[16] *See Traylor*, 280 Ga. at 404-05 (4) (a) (holding trial court did not err by failing to hold a competency hearing when there was no evidence of irrational behavior or unusual demeanor on his part or any medical opinion regarding his competence that would have cause the trial court to make further inquiry about it); *Haygood v. State*, 289 Ga. App. 187, 190 (1) (656 SE2d 541) (2008) (holding that the trial court did not err in failing to hold a competency hearing when defendant's counsel testified "that counsel was able to communicate with [the defendant]; that [he] responded to counsel's questions appropriately; that [he] appreciated the seriousness of the charges against him; and that [he] gave no indication that he did not understand the proceedings"); *Flesche v. State*, 254 Ga. App. 3, 5-6 (1) (561 SE2d 160) (2002) (holding that the trial court was not required to hold a competency hearing when, *inter alia*, the defendant "displayed no outbursts or episodes of disorientation" during the trial, he had always been lucid in his discussions with counsel, and there was no prior medical opinion that he was incompetent or mentally impaired).

but not limited to, proof of motive, opportunity, *intent*, preparation, plan, knowledge, identity, or absence of mistake or accident.[17]

But evidence that is offered for a proper purpose under Rule 404 (b) may still be excluded under OCGA § 24-4-403 ("Rule 403") if the evidence's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[18] And to properly weigh the considerations of these two evidentiary rules and evaluate the admissibility of so-called "other acts" evidence,[19] the Supreme Court of Georgia has adopted a three-part test: "(1) the

---

[17] (Emphasis supplied).

[18] OCGA § 24-4-403; *accord Morris v. State*, 340 Ga. App. 295, 306 (4) (797 SE2d 207) (2017) (punctuation omitted).

[19] *See Olds v. State*, 299 Ga. 65, 69 (2) (786 SE2d 633) (2016) ("Many provisions of the new Evidence Code were borrowed from the Federal Rules of Evidence, and when we consider the meaning of these provisions, we look to decisions of the federal appellate courts construing and applying the Federal Rules, especially the decisions of the United States Supreme Court and the Eleventh Circuit. Rule 404 (b) is one such provision, and so, when we have considered the meaning of Rule 404 (b), we consistently have looked for guidance in the decisions of the federal appellate courts construing and applying Federal Rule of Evidence 404 (b)." (citations omitted)); *State v. Jones*, 297 Ga. 156, 158 (1) (773 SE2d 170) (2015) (noting that Georgia courts have adopted the three-part test used by the Eleventh Circuit Court of Appeals in evaluating other-acts evidence under the Federal Rules of Evidence, upon which

evidence must be relevant to an issue other than defendant's character; (2) the probative value must not be substantially outweighed by its undue prejudice; [and] (3) the government must offer sufficient proof so that the jury could find that defendant committed the act."[20] Lastly, we review a trial court's decision "to admit evidence of other crimes for a clear abuse of discretion."[21]

Here, before trial, the State moved to admit evidence of some of Staley's prior convictions. And ultimately, the trial court found that his prior convictions for possession of a firearm by a convicted felon, aggravated assault, and robbery were admissible. The court concluded that these prior convictions were relevant to prove Staley's intent to commit the charged crimes in this case. In doing so, the court noted that Staley made his intent a material issue by pleading not guilty. This matters because the State is "burdened to show that he intended to place the victim in fear for

Georgia's new Evidence Code is modeled); *see also* Ronald L. Carlson and Michael Scott Carlson, Carlson on Evidence, p. 137 (6th ed. 2018) (noting that "[t]he adoption of OCGA § 24-4-404 (b) provides Georgia with a statutory framework for the admission of other acts evidence for non-character purposes").

[20] *Bradshaw v. State*, 296 Ga. 650, 656 (3) (769 SE2d 892) (2015) (punctuation omitted); *accord Morris*, 340 Ga. App. at 306 (4).

[21] *Jernigan v. State*, 357 Ga. App. 415, 420-21 (2) (848 SE2d 707) (2020) (punctuation omitted).

his life and that he intended to commit theft." The court also found the extrinsic evidence satisfied the requirements of Rule 403 because (1) the State needed the evidence, as it relied on the victim's testimony, the veracity of which may be challenged; (2) the prior crimes were similar to those in this case because they involved a handgun, a single victim, and theft; and (3) the prior crimes were committed only five years before the ones at issue. In sum, the court found the unfair prejudice of admitting the prior-crimes evidence did not substantially outweigh its probative value.

As to the first requirement of the Rule 404 (b) test (*i.e.*, the extrinsic evidence must be relevant to an issue other than character), Staley contends his prior convictions were not relevant to the issue of intent because this was a case of mistaken identity, and he never argued that he lacked the criminal intent to rob Trejo at gunpoint. But as our Supreme Court has explained, a defendant who enters a not guilty plea "makes intent a material issue which imposes a substantial burden on the government to prove intent, which it may prove by qualifying Rule 404 (b) evidence absent affirmative steps by the defendant to remove intent as an issue."[22] And unlike

---

[22] *Bradshaw*, 296 Ga. at 656-57 (3) (punctuation omitted); *accord Olds*, 299 Ga. at 71 (2).

a claim of self-defense in which a defendant admits committing the crime,[23] Staley's denial of committing the armed robbery did not remove the State's substantial burden of establishing that, not only did Staley commit the charged offenses, but he *intended* to do so.[24] So, we reject Staley's argument that, although he pleaded not guilty, he took affirmative steps to remove intent as an issue merely because he claims this is a case of mistaken identity.

As to the second prong of the Rule 404 (b) test (*i.e.*, compliance with Rule 403), Staley maintains the probative value of admitting his prior convictions was substantially outweighed by unfair prejudice. We disagree.

Under Rule 403, relevant evidence may be excluded if

its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by

---

[23] *See Strong v. State*, 309 Ga. 295, 310 (2) (d) (1) (845 SE2d 653) (2020) (explaining that although the defendant "put his intent at issue by pleading not guilty, the State's need for evidence to prove his intent was 'extremely low' because his sole defense at trial was self-defense").

[24] *See Clark v. State*, 315 Ga. 423, 441 (4) (883 SE2d 317) (2023) (approving a court's jury instruction that intent is an essential element of every crime and must be proven beyond a reasonable doubt); *Reyes v. State*, 322 Ga. App. 496, 501-02 (4) (745 SE2d 738) (2013) (approving of court's jury instruction that intent is an essential element of every crime the State must prove beyond a reasonable doubt and a defendant will not be presumed to have acted with intent).

considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Indeed, the major function of Rule 403 is to "exclude matters of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."[25] Even so, the trial court's decision to "exclude evidence under Rule 403 is an extraordinary remedy which should be used only sparingly."[26] And in considering the probative value of evidence offered to prove intent, these "circumstances include the prosecutorial need for the extrinsic evidence, the overall similarity between the extrinsic act and the charged offense, and the temporal remoteness of the other act."[27]

In this case, the trial court did not abuse its discretion in determining that the prosecution had a significant need to present the other-acts evidence. Staley all but

---

[25] *McAllister v. State*, 351 Ga. App. 76, 81 (1) (830 SE2d 443) (2019) (punctuation omitted); *accord Kirby v. State*, 304 Ga. 472, 480 (4) (819 SE2d 468) (2018); *Hood v. State*, 299 Ga. 95, 103 (4) (786 SE2d 648) (2016).

[26] *Kirby*, 304 Ga. at 480 (4) (punctuation omitted); *see Baker v. State*, 318 Ga. 431, 442 (2) (a) (899 SE2d 139) (2024) ("[T]he exclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly." (punctuation omitted)); *Harris v. State*, 314 Ga. 238, 262 (3) (a) (875 SE2d 659) (2022) (same).

[27] *Kirby*, 304 Ga. at 481 (4) (a); *accord Castillo-Velasquez v. State*, 305 Ga. 644, 648 (2) (827 SE2d 257) (2019).

concedes this point, repeatedly asserting that the State's case was "admittedly weak." And he is not necessarily wrong. The State's case against Staley consisted almost entirely of a single witness, whose credibility could be impeached and memory challenged. Additionally, other than the firearm found in the rental car, there was a lack of physical evidence linking Staley to the robbery. So, the prosecutorial need for the other-acts evidence weighs against exclusion under Rule 403.[28]

Next, as to the overall similarity of the prior and current crimes, they are essentially identical. The trial court admitted evidence of Staley's prior convictions for possession of a firearm by a convicted felon, aggravated assault, and robbery; and in this case, he was charged with armed robbery, aggravated assault, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon. Notably, Staley does not dispute that all of these crimes involved a handgun, a single victim testifying, and theft.[29] As a result, the substantial similarities between

---

[28] *See Brantley v. State*, 370 Ga. App. 757, 765-66 (3) (899 SE2d 284) (2024) (finding that "the States need for the [other acts] evidence was great based upon [the defendant's] attacks on [a witness's] credibility and the lack of any physical evidence"); *McAllister*, 351 Ga. App. at 84-85 (1) (c) ("[W]hen the defendant seeks to attack a victim's credibility, the State has an increased need to introduce evidence of prior acts.").

[29] The other two victims—the victim's friends—did not testify at trial.

Staley's prior and current crimes also weigh in favor of admitting the prior-acts evidence.[30]

As to temporal proximity, the prior crimes occurred only five years before the charged offenses; and we have held that longer gaps of time between prior and current offenses do not warrant exclusion under Rule 403.[31] And importantly, the trial court gave a detailed limiting instruction, indicating twice that the jury was permitted to

---

[30] *See Bradshaw*, 296 Ga. at 657 (3) (holding that trial court did not abuse its discretion in determining that the probative value of an Ohio crime, which was factually similar to the Georgia crimes, was not outweighed by undue prejudice); *Johnson v. State*, 368 Ga. App. 762, 767 (1) (b) (ii) (890 SE2d 325) (2023) (holding that other-acts evidence was probative of the defendant's *intent* to commit the charged offense because the prior and instant crimes both involved strangulation and asportation of a woman); *see also Jernigan*, 357 Ga. App. at 424 (2) (a) (ii) (noting that when other-acts evidence is introduced to "prove intent [as opposed to identity][,] a lesser degree of similarity between the charged crime and the extrinsic evidence is required" (punctuation omitted)).

[31] *See Harris v. State*, 358 Ga. App. 204, 206 (2), 208 (4) (854 SE2d 374) (2021) ("The fact that the prior incident took place more than twenty years earlier does not render the evidence inadmissible [under Rule 403]."); *Sturgis v. State*, 356 Ga. App. 219, 220-22 (842 SE2d 82) (2020) (holding that, although the prior child molestation offenses at issue occurred between 22 and 10 years prior to trial, the offenses were "similar enough" to the instant offense such that they could aid the jury in determining whether the defendant committed); *Boyd v. State*, 351 Ga. App. 469, 473 (3) (829 SE2d 163) (2019) ("The fact that the other acts were remote in time—between 16 and 22 years before—did not demand a different ruling by the trial court. There is no bright-line rule as to how old is too old . . . ." (punctuation omitted)).

consider evidence of alleged prior crimes only if the evidence related to intent, and not for any other purpose. The court also instructed the jury that it could *not* consider such evidence to infer Staley was of a character that would commit the charged offenses. Thus, the trial court "mitigated any risk of unfair prejudice by giving a limiting instruction."[32]

All of the relevant factors, then, weigh against excluding the prior-acts evidence under Rule 403, and we will not disturb the trial court's conclusion that it satisfied the rule's requirements. In reaching this conclusion, we are mindful of the discretion afforded to trial courts in admitting or excluding evidence,[33] that Rule 403 is an extraordinary remedy to be used only sparingly,[34] and that "in reviewing the admission of evidence under Rule 403, we look at the evidence in a light most favorable to its

---

[32] *Jernigan*, 357 Ga. App. at 426 (2) (a) (ii); *see Moton v. State*, 351 Ga. App. 789, 793-94 (833 SE2d 171) (2019) (holding that the risk of unfair prejudice of admitting other-acts evidence was "reduced" by the trial court's limiting instruction regarding that evidence).

[33] *See Olds*, 299 Ga. at 70 (2) ("The application of the Rule 403 test is a matter committed principally to the discretion of the trial courts.").

[34] *See id.* ("[T]he exclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly." (punctuation omitted)).

admission, maximizing its probative value and minimizing its undue prejudicial impact."[35]

Lastly, as to the fourth consideration for admissibility under Rule 404 (b), the State offered sufficient proof for the jury to find that Staley committed the prior criminal acts. More precisely, the State presented certified copies of Staley's prior convictions. And the admission of certified convictions satisfies this requirement of Rule 404 (b).[36] So, because all of the Rule 404 (b) factors favor admitting Staley's prior convictions, the trial court did not abuse its discretion in doing so.

3. Staley also argues his trial counsel was ineffective for not moving to suppress illegally obtained evidence. This claim also lacks merit.

To prevail on his Sixth Amendment claim of ineffective assistance, a claimant must show "both that counsel's performance was deficient and that the deficient

---

[35] *Wilson v. State*, 312 Ga. 174, 190 (2) (860 SE2d 485) (2021) (punctuation omitted).

[36] *See Tariq-Madyun v. State*, 361 Ga. App. 219, 224 (3) (a) (863 SE2d 703) (2021) ("[T]he state introduced certified copies of [the defendant's] guilty pleas for the robberies, which were sufficient proof that he committed those crime."); *Harvey v. State*, 344 Ga. App. 761, 771 (2) (a) (iii) (811 SE2d 479) (2018) ("[T]he State presented certified copies of the [defendant's] guilty pleas to the prior charges. This was sufficient proof of the [his] commission of the other acts to authorize the admission of this evidence.").

performance prejudiced [him]."[37] And as to deficient performance, a claimant must show that "his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms."[38] And when reviewing counsel's performance, we apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance."[39] So, to show he was prejudiced by the performance of his counsel, a claimant "must prove a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[40] A reasonable probability, then, is one "sufficient to undermine confidence in the outcome."[41] Finally, the trial court's factual findings and credibility determinations are "reviewed

---

[37] *McAllister*, 351 Ga. App. at 93 (6) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)).

[38] *Jackson v. State*, 306 Ga. 266, 272 (5) (830 SE2d 99) (2019) (punctuation omitted); *accord Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013).

[39] *Jackson*, 306 Ga. at 272 (5) (punctuation omitted); *accord Romer*, 293 Ga. at 344 (3).

[40] *Jackson*, 306 Ga. at 272 (5) (punctuation omitted); *accord Arnold v. State*, 292 Ga. 268, 269 (2) (737 SE2d 98) (2013).

[41] *Jackson*, 306 Ga. at 272 (5) (punctuation omitted); *accord Arnold*, 292 Ga. at 269 (2).

under a clearly erroneous standard, but this Court will independently apply the legal principles to the facts."[42] With these guiding principles in mind, we turn now to Staley's specific claims of error.

(a) Staley contends his trial counsel was ineffective for not seeking to suppress evidence seized from the pat-down search and the search of "his vehicle" because it exceeded anything permitted by the Fourth Amendment.[43]

The Supreme Court of the United States has construed the Fourth Amendment to the United States Constitution[44] as delineating three tiers of police-citizen

---

[42] *Jackson*, 306 Ga. at 272 (5) (punctuation omitted); *accord Jones v. State*, 305 Ga. 750, 755 (4) (827 SE2d 879) (2019).

[43] Staley's trial counsel testified at the motion for new trial hearing, but he either did not recall things or provided nonresponsive answers. He also seemed to confuse, at times, this case with another one. It is unclear, then, whether trial counsel had any strategic reasons for failing to file a motion to suppress.

[44] U.S. CONST. amend IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."); *see* Ga. Const. art. I, § 1, ¶ XIII ("The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause supported by oath or affirmation particularly describing the place or places to be searched and the persons or things to be seized.").

encounters:[45] "(1) communication between police and citizens involving no coercion or detention . . . , (2) brief seizures that must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause."[46] In first-tier encounters, "police may approach citizens, ask for identification, ask for consent to search, and otherwise freely question the citizen without any basis or belief of criminal activity so long as the police do not detain the citizen or convey the message that the citizen may not leave."[47] And a second tier encounter "occurs when the officer actually conducts a brief investigative stop of the citizen [under *Terry v. Ohio*]."[48]

---

[45] *Miller v. State*, 351 Ga. App. 757, 761 (1) (833 SE2d 142) (2019) (punctuation omitted); *see State v. Walker*, 295 Ga. 888, 889 (764 SE2d 804) (2014) (noting that Fourth Amendment jurisprudence recognizes three tiers of police-citizen encounters).

[46] *Miller*, 351 Ga. App. at 761 (1) (punctuation omitted); *accord Walker*, 295 Ga. at 889.

[47] *Miller*, 351 Ga. App. at 761 (1) (punctuation omitted); *accord Walker*, 295 Ga. at 889; *see In the Interest of D. H.*, 285 Ga. 51, 53 (2) (673 SE2d 191) (2009) (explaining that, during a first-tier encounter, an officer "may approach citizens, ask for identification, and freely question the citizen without any basis or belief that the citizen is involved in criminal activity, as long as the officers do not detain the citizen or create the impression that the citizen may not leave[,] [and] [s]o long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required" (punctuation omitted)).

[48] *Walker*, 295 Ga. at 889; *see Terry v. Ohio*, 392 U.S. 1 ( 88 S Ct 1868, 20 LE2d 889) (1968); *Lyons v. State*, 244 Ga. App. 658, 660 (1) (535 SE2d 841) (2000) ("In

27

Indeed, in a second-tier encounter, "even in the absence of probable cause, a police officer may stop persons and detain them briefly, when the officer has a particularized and objective basis for suspecting the persons are involved in criminal activity."[49]

We have also held that "[t]he purpose of a *Terry* pat-down is to determine whether a person is carrying a weapon and not to discover evidence of a crime."[50] And the Supreme Court of the United States has "clarified the extent of police authority to seize items felt during a *Terry* pat-down search and extended *Terry*'s exception to

---

general, investigative stops of vehicles are analogous to *Terry* stops. While a reasonable investigative stop does not offend against the Fourth Amendment, a *Terry* stop is subject to strict boundaries regarding duration, intent, and scope. Such a stop has been described by this court as a brief stop, limited in time to that minimally necessary to investigate the allegation invoking suspicion, and limited in scope to identification and limited questioning reasonably related to the circumstances that justified the initiation of the momentary stop." (punctuation and citation omitted)); *see also Carter v. State*, 287 Ga. App. 597, 598 (651 SE2d 759) (2007) (describing a *temporary seizure* and pat-down for weapons as a *"Terry*-type" encounter).

[49] *Ewumi v. State*, 315 Ga. App. 656, 658 (1) ( 727 SE2d 257) (2012) (punctuation omitted); *accord In the Interest of G. M. W.*, 355 Ga. App. 151, 155 (b) (842 SE2d 920) (2020).

[50] *State v. Henderson*, 263 Ga. App. 880, 882 (589 SE2d 647) (2003); *see Ramsey v. State*, 306 Ga. App. 726, 728 (703 SE2d 339) (2010) ("A *Terry* pat-down, unlike a full search, is conducted for the purpose of ensuring the safety of the officer and of others nearby, not to obtain evidence for use at trial." (punctuation omitted)).

Fourth Amendment warrant requirements by recognizing the 'plain feel' doctrine."[51] Under this doctrine, if—during a lawful pat-down search—an officer "feels an object whose contours or mass makes it immediately identifiable as contraband, that officer can seize the item."[52] Thus, for evidence to be admissible under the plain-feel doctrine, the searching officer "must express a degree of certainty in identifying the item."[53]

Here, it is undisputed that when Officer Kelley responded to the 911 call, Staley consented to a pat-down search *after* police concluded their investigation into the woman who was potentially in danger. For the sake of argument, we assume—without deciding—that Staley's interactions with police constituted a second-tier encounter, which means law enforcement needed to have a reasonable suspicion of criminal activity to justify the seizure.[54] And during the search, Kelley retrieved "a set of keys and a key fob" from Staley's pocket that unlocked the Dodge.

---

[51] *Henderson,* 263 Ga. App. at 882-83 (punctuation omitted).

[52] *Henderson*, 263 Ga. App. at 883 (punctuation omitted); *accord Ramsey*, 306 Ga. App. at 730.

[53] *Henderson*, 263 Ga. App. at 883 (punctuation omitted); *accord Ramsey*, 306 Ga. App. at 730.

[54] *See supra* note 46 & accompanying text.

Staley argues the search of his pocket was illegal based on the plain-feel doctrine because "no reasonable officer would have confused car keys for a weapon or any obvious form of contraband."[55] But we are unconvinced that Staley's initial consent to the search of his person did not extend to a search of his pockets.[56] In any event, when an appellant claims trial counsel was "deficient for failing to file a motion to suppress, he or she must make a *strong showing* that the damaging evidence would have been suppressed had counsel made the motion."[57] And to do so, he or she "must overcome the strong presumption that trial counsel's conduct falls within the broad

---

[55] *See supra* notes 52-53 & accompanying text.

[56] *Compare Andrews v. State*, 320 Ga. App. 792, 795-796 (740 SE2d 748) (2013) (explaining that when defendant consents to "pat down" search, consent extends to weapons and contraband discovered under the plain-feel doctrine) *with Ware v. State*, 309 Ga. App. 426, 428 (710 SE2d 627) (2011) (explaining that although the record contained no evidence that the officer believed the item he felt in defendant's pocket was contraband, seizure of the item was legal because defendant consented to a search of his pocket); and *State v. Davis*, 283 Ga. App. 200, 203 (2) (641 SE2d 205) (2007) (holding that officers not constrained by plain-feel doctrine where defendant consented to search of his pockets).

[57] *Reese v. State*, 317 Ga. 189, 201 (4) (891 SE2d 835) (2023) (citation and punctuation omitted) (emphasis supplied); *accord Evans v. State*, 308 Ga. 582, 586 (3) (842 SE2d 837) (2020).

range of reasonable professional conduct."[58] Significantly, making such a showing is an "unusually heavy burden to carry[,]"[59] and Staley has not done so here. Indeed, the record is devoid of *any* testimony establishing what kind of contraband Officer Kelley believed was "immediately identifiable" in Staley's pocket, much less why he believed it with a degree of certainty.[60]

Staley also presented no evidence on the scope of his consent to the pat-down search, as he testified at the motion-for-new-trial hearing that he did not consent to the search at all.[61] Indeed, at trial, one of the law-enforcement officers who responded

---

[58] *Chapman v. State*, 273 Ga. 348, 350 (2) (541 SE2d 634) (2001); *see Sutton v. State*, 338 Ga. App. 724, 732 (3) (791 SE2d 618) (2016) ("[T]rial counsel's decisions are presumed to be strategic, and [the defendant] must show that the presumed strategy was so unsound that no reasonable lawyer would have adopted it to show deficient performance (punctuation omitted)).

[59] *Guerre v. State*, 373 Ga. App. 774, 782 (3) (908 SE2d 704) (2024) (punctuation omitted).

[60] Staley and his defense counsel were the only two witnesses who testified at the motion-for-new-trial hearing. And as previously mentioned, Staley's counsel could not answer many of the questions he was asked, and when asked about his decision not to file a motion to suppress evidence, he appeared to confuse this case with one in which his client pleaded guilty. Nevertheless, regardless of his counsel's testimony, Staley failed to present any evidence suggesting that a motion to suppress the car-key evidence would have been successful.

[61] As to Staley's self-serving testimony at the motion-for-new-trial hearing that he did *not* consent to the pat-down search, it conflicted with the evidence presented

to the scene testified that he believed the Dodge and another car might belong to the occupants of Staley's hotel room because they were "parked directly in front of that particular room." That officer also testified that Officer Kelley and another officer "got a consent in reference to checking the individuals to see if there were any keys that may belong to either vehicle that was parked there." Given the limited evidence Staley presented at the motion-for-new-trial hearing and the foregoing testimony that he consented to a search of his person that was specifically performed to find car keys, he simply has not met his burden of establishing that his counsel was deficient in not moving to suppress evidence seized from his pocket. And because Staley failed to meet his burden on "one prong of [the *Strickland*] two-prong test, we need not review the other prong."[62]

at trial, and it is not the function of this Court to resolve conflicts in the evidence or make credibility determinations. And the trial court, at least implicitly, found Staley's self-serving, post-trial testimony to not be credible, and it was entitled to do so. *See Lopez v. State*, 318 Ga. 664, 671 (3) (a) (898 SE2d 441) (2024) (noting, in the context of an ineffective-assistance-of-counsel claim, the trial court was authorized to credit counsel's testimony); *Anthony v. State*, 311 Ga. 293, 297 (3) (857 SE2d 682) (2021) (explaining, in the context of an ineffective assistance claim, that the trial court was authorized to implicitly credit trial counsel's testimony at the motion-for-new-trial hearing over the appellant's contradictory testimony).

[62] *McAllister v. State*, 351 Ga. App. 76, 93 (6) (830 SE2d 443) (2019); *accord Gomez v. State*, 300 Ga. 571, 573 (797 SE2d 478) (2017).

Turning to law enforcement's search of the Dodge, one exception to the warrant requirement is the "search or seizure of abandoned property" because "one cannot manifest a reasonable expectation of privacy in an item once it has been abandoned."[63] Importantly, abandonment is mostly a question of intent, and "intent may be inferred from words spoken, acts done, and other objective facts."[64] And here, even if someone else *did* have an ownership interest in the car and a reasonable expectation of privacy in its contents, Staley did not. He unequivocally and repeatedly denied owning the car. So, believing it abandoned, the responding officers—for whatever reason—chose to search the vehicle. In any event, because Staley repeatedly told the officers the Dodge was not his car, he "has no standing to complain of a

---

[63] *State v. Nesbitt*, 305 Ga. App. 28, 31 (699 SE2d 368) (2010) (punctuation omitted); *see Keilholtz v. State*, 261 Ga. App. 1, 4 (2) (581 SE2d 660) (2003) ("The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." (punctuation omitted)).

[64] *Nesbitt*, 305 Ga. App. at 31 (punctuation omitted); *accord Keilholtz*, 261 Ga. App. at 4 (2).

search or seizure of property he has *voluntarily* abandoned."[65] And under these circumstances, any motion to suppress evidence retrieved during the search of the abandoned car would not have been successful, and "[f]ailure to pursue a meritless motion does not amount to ineffective assistance."[66]

(b) Next, Staley claims he received ineffective assistance of counsel because his trial counsel did not move to suppress evidence that Trejo identified Staley in an impermissibly suggestive photographic lineup.

A motion to suppress an out-of-court identification by a witness as "impermissibly suggestive in violation of due process . . . requires a showing that the identification was so impermissibly suggestive that it could result in a substantial

---

[65] *Wolf v. State*, 291 Ga. App. 876, 878 (1) (663 SE2d 292) (2008) (punctuation omitted); *see Driggers v. State*, 295 Ga. App. 711, 714 (2) (673 SE2d 95) (2009) ("A defendant who abandons seized property lacks standing to challenge the validity of the search and seizure.").

[66] *Huggins v. State*, 362 Ga. App. 450, 456 (2) (868 SE2d 840) (2022); *see Howard v. State*, 318 Ga. 681, 687 (2) (899 SE2d 669) (2024) ("When a defendant claims that his counsel was ineffective for failing to file a motion to suppress evidence, he cannot show that his counsel performed deficiently unless he can show that the motion would have been granted.").

likelihood of misidentification[.]"[67] And we employ a two-step process to determine whether identification evidence meets that test. First, we must decide whether "the identification procedure used was impermissibly suggestive."[68] Second, if a trial court properly concludes that "the State employed an impermissibly suggestive pre-trial identification procedure, the issue becomes whether, considering the totality of the circumstances, there was a substantial likelihood of irreparable misidentification."[69] But if a trial court properly determines the identification procedure is "not unduly suggestive, it is not necessary to consider whether there was a substantial likelihood of irreparable misidentification."[70]

On appeal, Staley contends the photographic lineup shown to Trejo was impermissibly suggestive because, although all of the men in the pictures were black males with short hair and wearing a black t-shirt, he was the only individual with

[67] *Howard*, 318 Ga. at 687 (2); *accord Lewis v. State*, 314 Ga. 654, 662 (3) (b) (878 SE2d 467) (2022).

[68] *Howard*, 318 Ga. at 687 (2) (punctuation omitted); *accord Lewis*, 314 Ga. at 662 (3) (b).

[69] *Howard*, 318 Ga. at 687 (2) (punctuation omitted); *accord Lewis*, 314 Ga. at 662 (3) (b).

[70] *Howard*, 318 Ga. at 687 (2) (punctuation omitted); *accord Lewis*, 314 Ga. at 662 (3) (b).

visible tattoos. And to be sure, Trejo initially testified that when he saw the photos he was "thinking between him and him, but that other one doesn't have tattoos so I told [the officer] this one [*i.e.*, Staley]." Even so, Trejo clarified this testimony as follows:

> Q. You were choosing between two pictures, but you chose the one that had that tattoo; is that correct?
>
> A. I chose a person that *I was sure* it was.
>
> . . .
>
> Q. Did any of the other pictures the police showed you have anyone with tattoos?
>
> A. I don't remember that. All I do remember is that [the officer] told me to make sure that what I chose was what I remembered and to just take my time, but to *make sure* that I chose the person that I remembered.[71]

Under these circumstances, the trial court concluded the lineup was not impermissibly suggestive, stating that the men all looked similar and the tattoos on Staley's neck were not "readily noticeable."

But even if the lineup were impermissibly suggestive, we must still decide whether, considering the totality of the circumstances, there was a substantial

---

[71] (Emphasis supplied).

likelihood of irreparable misidentification.[72] And here, whether or not the photo identification procedure used with Trejo was impermissibly suggestive, we conclude that Staley "has not shown that there was a substantial likelihood of irreparable misidentification, such that a motion to suppress the photo identification evidence would have succeeded."[73]

In evaluating the likelihood of irreparable misidentification, a trial court considers whether, "under the totality of the circumstances, the identification is reliable."[74] In doing so, the court considers the following factors: "(1) a witness's opportunity to view the accused at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the accused; (4) the

---

[72] *See supra* note 69 & accompanying text.

[73] *Howard*, 318 Ga. at 687 (2); *see Newton v. State*, 308 Ga. 863, 863, 867 (2) (843 SE2d 857) (2020) (concluding that, even assuming photo array was impermissibly suggestive, defendant had not shown a substantial likelihood of irreparable misidentification, and thus trial court did not err in denying motion to suppress).

[74] *Howard*, 318 Ga. at 687-88 (2); *see Newton*, 308 Ga. at 867 (2) (explaining that, in evaluating the likelihood of irreparable misidentification, "The ultimate question is, whether under the totality of the circumstances, the identification is reliable." (punctuation omitted)).

witness's level of certainty at the confrontation; and (5) the length of time between the crime and the confrontation."[75]

In this case, most of the foregoing factors support a finding that there is not a *substantial* likelihood of irreparable misidentification. As to his opportunity to view Staley at the time of the crime, Trejo testified that the parking lot where he was robbed had "a lot of light"; his assailant was only 12 inches away for *two* minutes; and nothing covered Staley's face. Indeed, at trial, Trejo identified Staley again as his attacker, noting that "a face like that in front of me holding a gun, I'm never going to forget." And significantly, when asked about the photographic lineup, Trejo testified—at least twice—that he was sure Staley was the perpetrator. Trejo gave no indication at trial, then, that he was uncertain about Staley being the perpetrator. There was also only a two-month gap between the robbery and when Trejo viewed the photo lineup. Thus, there does not appear to have been a substantial risk of Trejo misidentifying Staley.[76] Staley has failed to show, then, that his trial counsel was

---

[75] *Howard*, 318 Ga. at 688 (2); *accord Newton*, 308 Ga. at 867 (2).

[76] *See McBride v. State*, 297 Ga. App. 421, 422-23 (677 SE2d 438) (2009) (holding there was no substantial chance of misidentification when, *inter alia*, the witnesses had ample opportunity to observe the defendant during the crime, the transaction took place during sunlight hours, one witness dealt with the defendant on

ineffective for failing to file what would have been a meritless motion to suppress the photographic lineup.[77]

4. Staley also argues the trial court erred in allowing Trejo to testify about the gun's appearance. This claim is likewise without merit.

OCGA § 24-6-602 provides as follows:

A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge

---

a face-to-face basis, another witness observed the transaction and both witnesses were able to describe the defendant by the clothes he was wearing, and they identified the defendant at trial); *Doublette v. State*, 278 Ga. App. 746, 749 (1) (629 SE2d 602) (2006) (holding that, even if a photographic lineup was unduly suggestive, there was not a substantial likelihood of irreparable misidentification when the witness had a "good opportunity" to view the assailant at the time of the crime, the witness was sure of her choice, the defendant had stood front of her in the daytime, and he was not concealed in any way); *Johnson v. State*, 234 Ga. App. 21, 21-22 (2) (506 SE2d 189) (1998) (holding that, pretermitting whether a photographic lineup was unduly suggestive, it was still admissible when, *inter alia*, "the victim testified that the robber was standing directly in front of him; that the gas station was well lighted at the time of the robbery; that he examined the robber's face for a second or two seconds; [and] that this view was enough for him to get a 'good look' at his assailant"); *Jones v. State*, 220 Ga. App. 236, 236 (1) (469 SE2d 379) (1996) (holding that, regardless of whether the photographic line up unduly suggestive, the trial court did not abuse its discretion in denying a motion to suppress it when victim had ample opportunity to observe the defendant; was face-to-face with the attacker only six to eight inches away for at least 3 seconds; she gave a description that matched the defendant at the scene; and she had a high level of certainty).

[77] *See supra* note 66 & accompanying text.

of such matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony.

So, under that rule (as under the corresponding federal rule), "witnesses may testify about events they personally observed."[78] Nevertheless, a court should exclude testimony for "lack of personal knowledge if the witness could not have actually perceived or observed that which he testifies to."[79]

Here, there was conflicting evidence as to whether Trejo observed the gun—which was primarily held against his stomach during the attack—and if so, how much of it he could see. Trejo initially testified that he could not see the gun and was "just seeing [Staley's] face and him telling me to give him my money." But almost immediately, Trejo clarified that he did see the gun, but he did not "know the make

---

[78] *Sconyers v. State,* 318 Ga. 855, 866 (4) (901 SE2d 170) (2024); *see Favors v. State*, 296 Ga. 842, 845-46 (3) (770 SE2d 842) (2015) ("A witness who personally observed the event to which she is testifying may state her impressions drawn from, and opinions based upon, the facts and circumstances observed by her." (punctuation omitted)).

[79] *Sconyers,* 318 Ga. at 866 (4); *see United States v. Gutierrez de Lopez*, 761 F3d 1123, 1132 (3) (a) (i) (10th Cir. 2014) (noting that establishing personal knowledge for purposes of Rule 602 is "not difficult" and explaining that "[a] court should exclude testimony for lack of personal knowledge *only* if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to" (punctuation omitted) (emphasis supplied)).

or model or what kind it was or anything like that." And when asked what he could recall about the gun, Trejo stated, "all I saw was that it was . . . dark, it wasn't like shiny, it didn't have what they call like chromed, and then [he] heard [Staley] cock it." Trejo did acknowledge that he was not aware of whether the gun was small or large.

Although Staley challenges whether Trejo had sufficient personal knowledge to testify about the gun, in substance, he essentially takes issue with Trejo's credibility—given his arguably conflicting responses when testifying about the gun. But it is well established that "[r]esolving evidentiary conflicts and inconsistencies, and assessing witness credibility, are the province of the factfinder, not this Court."[80] And the jury heard Trejo's complete testimony regarding his observation of the gun, which included arguably conflicting or vague answers, and it apparently found it credible as a whole. Again, under Rule 602, "[e]vidence to prove personal knowledge may. . . consist of the witness's own testimony." So, once Trejo testified to his limited

---

[80] *Garner v. State*, 346 Ga. App. 351, 355 (1) (816 SE2d 368) (2018) (punctuation omitted); *accord Odett v. State*, 273 Ga. 353, 353-54 (1) (541 SE2d 29) (2001).

personal knowledge of the gun, it was then for the jury to determine the weight it should be given.[81]

5. Finally, Staley maintains that the cumulative effect of the trial court's errors and ineffective assistance he received entitles him to relief. Once again, we disagree.

As our Supreme Court has recently explained, to establish cumulative error, a defendant must "demonstrate that *at least two* errors were committed in the course of the trial and considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial."[82] But when reviewing a claim of cumulative prejudice, we "evaluate only the effects of matters determined to be error, not the cumulative effect of non-errors."[83]

---

[81] *See Brown v. State*, 314 Ga. 193, 200 (3) (875 SE2d 784) (2022) (concluded that two witnesses had sufficient personal knowledge of a shooting and the shooter such that their testimony regarding those issues did not violate Rule 602); *Draughn v. State*, 311 Ga. 378, 385 (4) (858 SE2d 8) (2021) (holding that a witness testified from personal knowledge, as permitted by Rule 602, when he identified defendant in still images taken from surveillance footage).

[82] *Huff v. State*, 315 Ga. 558, 567-68 (6) (883 SE2d 773) (2023) (punctuation omitted) (emphasis supplied); *accord Wood v. State*, 316 Ga. 811, 821 (5) (890 SE2d 716) (2023).

[83] *Flood v. State*, 311 Ga. 800, 808-09 (2) (d) (860 SE2d 731) (2021) (punctuation omitted).

So, because Staley has not established a single error occurred at trial, there can be no cumulative effect of the alleged errors.[84]

For all of these reasons, we affirm Staley's convictions.

*Judgment affirmed. Mercier, C. J., and Land, J., concur.*

---

[84] *See Jackson v. State*, 317 Ga. 95, 107 (4) (891 SE2d 866) (2023) (holding that, even if the two alleged errors could be aggregated for cumulative-error review, the defendant failed to show that the combined prejudicial effect of these errors required a new trial); *Huff*, 315 Ga. at 568 (6) ("Appellant's [cumulative-error] claim fails because Appellant has not demonstrated that the prejudicial effect of the assumed trial[-]court errors and ineffective assistance denied him a fundamentally fair trial, given the strong evidence against him . . . .").